**UNITED STATES of America, Plaintiff,**

v.

**Guler ORMAN and Gunay Orman, Defendants.**

Crim. No. 76–CR–5.

United States District Court, D. Colorado.

July 12, 1976.

James L. Treece, U. S. Atty., by Daniel T. Smith, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Daniel J. Sears, Federal Public Defender, Denver, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

Let it be said at the outset that no member of the United States Attorney's staff had advance knowledge of any of the worrisome activities of Drug Enforcement Administration agents which I shall discuss presently. In fact, the Assistant United States Attorney in charge of this case, Daniel T. Smith, was aghast as the facts crept out, and at all times he has acted in complete accordance with the highest ethical standards. He did not participate in, and he reported to the Court posthaste developments in the case which I find have irretrievably prejudiced the rights of defendant, Guler Orman, and she is the only defendant before me because her sister, Gunay Orman, has not been apprehended.

At first glance, the case has to do with a routine one-count indictment charging distribution of heroin. The indictment was returned January 6, 1976, and an arrest warrant issued that date. Defendant, a 22-year old girl, was arrested in Paris, France, under that warrant, on February 4, 1976. She was willing to return to the United States immediately and voluntarily, but France insisted on prolonged extradition proceedings, and the extradition order did not issue for more than three months. Defendant was brought back to this country on May 10, 1976, and she appeared before the magistrate the next day. She was represented by Daniel J. Sears, the public defender, who arranged for the attendance of Turkish interpreters, defendant being a native of Turkey who speaks and understands only bits of English.

Two days later, a motion for release without bail was filed. The motion grounded on the proposition that defendant had been held in custody in Paris under arrest for the offense charged in this Court and that the interim time limits of the Speedy Trial Act do not permit exclusion of the times permitted to be excluded under 18 U.S.C. § 3161(h). The result is illogical, but it is inevitable under the clear language of the Act. The Congressional history is clear:

"Failure to commence the trial of a detained person under this section [the interim time limits section] results in the automatic review of the terms of release by the court and, in the case of a person already under detention, release from custody." *United States Code Congressional and Administrative News,* Vol. 4, 1974 Legislative Session, p. 7416.

*United States v. Tirasso,* (1976) 9 Cir. 532 F.2d 1298, 44 L.W. 2478, holds, and I agree:

"The language of section 3164 is straightforward. We find no ambiguity in its interpretation. . . . Under the clear language of the statute the reason for delay is irrelevant, so long as it is not occasioned by the accused or his counsel.

"The legislative history, moreover, makes it clear that release of the defendant from custody, and nothing less, is the sanction, for delay beyond the ninety day period. . . .

"Section 3164 does not speak of detention within a particular district. Nor does it provide any periods of exclusion for delay caused by the special circumstances of difficult cases. . . .

"In light of these facts, the wisdom of the result Congress has decreed is questionable. . . . [B]ut this result is the

only one open to us under the plain terms of the statute.

"It is discouraging that our highly refined and complex system of criminal justice is suddenly faced with implementing a statute that is so inartfully drawn as this one. But this is the law and we are bound to give it effect."

The motion for release under the Speedy Trial Act was heard on May 14, 1976, and defendant was ordered released on an unsecured bond conditioned upon the surrender of her passport to the Clerk of the Court. This hearing produced the first glimmer of troubles to come. Finding a Turkish interpreter in Colorado is no small task, but two Turkish students attending Colorado School of Mines were located. They planned a return to Turkey May 20, 1976, but they weren't much help at the hearing they did attend because it was apparent that they had difficulty communicating with defendant. Whether the communication gap was due to varying dialects of Turkish or was a result of the students' limited understanding of English, I was unable to ascertain. However, defendant's cousin lives in the Denver area, and he agreed to let defendant live with him while awaiting trial and agreed to assist her with her language difficulties. This was a particularly helpful development in light of the fact that the only qualified interpreter of Turkish we could locate wanted to charge more than the Administrative Office was allowed to pay.[1]

A flurry of motions ensued. Among the motions were a motion to disclose the identity of the informer and a motion raising Fourth, Fifth and Sixth Amendment questions. The motion to disclose the identity of the informer was heard first, and an *in camera* evidentiary hearing was held at which two DEA agents testified. They were in agreement with the Assistant United States Attorney and with each other that disclosure of the informer's identity would probably result in the death of one or more persons. However, it was manifest that under the principles of *Roviaro v. United States,* (1957) 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, and *United States v. Martinez,* (1973) 10 Cir., 487 F.2d 973, the informer's identity would have to be disclosed or the case would have to be dismissed because as was brought out in the *in camera* hearing the informer might provide defendant with a complete defense.

The Drug Enforcement Administration opted for disclosure of the informer's identity:

"THE COURT: The decision by the Drug Enforcement Administration to disclose the identity of the informer even though it puts human lives in risk is a considered decision that has been reviewed by appropriate authorities, and you are representing to the Court at this time that you will disclose it even though you have expressed the belief to the Court that one or more people may be killed as the result, is that correct?

"AGENT FARABAUGH: With extreme reluctance, we have reached that decision due to the other ramifications of the case, yes.

"THE COURT: You say 'we have reached it,' at what level has the decision been reached?

"AGENT FARABAUGH: At the level of the regional director here in Denver and with headquarters' concurrence."

At a later hearing[2] it leaked out that the

---

1. The DEA suggested that it could arrange to have INTERPOL furnish an interpreter to sit in on defendant's conferences with her lawyer and to interpret at trial. Having a policeman listen in on lawyer-client conversations did not appeal to me, but I was to learn later that DEA made other arrangements to eavesdrop, albeit it might have been more efficient from their viewpoint if I had ordered that there be police auditing of lawyer-client conversations. It was an order such as this which released the con-

victed defendants in *Yung v. Coleman,* (1934) D.C.Ida. 5 F.Supp. 702.

2. The hearing was closed to the public and open to the press. The public was excluded to protect the informer. The press was admitted because of my belief that we have a responsible press which will not endanger human life. The press has proven its responsibility. See, *Nebraska Press Association v. Stuart,* (1976) —— U.S. ——, 96 S.Ct. 2791, 49 L.Ed.2d ——.

decision to disclose the informer's identity resulted from a short telephone conference call among John R. Enright, Farabaugh, Burke, Baker and a Mr. Cusack in Washington, made the day of the first *in camera* hearing.[3] Enright testified that he knew little about the facts of the case; that he had never seen the file; that he didn't know what defendant was charged with; that he made no particular review of the facts; that the decision to issue a possible death warrant for innocent people didn't take very long to reach and that he knew of no jeopardy to human life if the informer's identity be disclosed. This conclusion and Enright's testimony were contradicted by the investigative file in the case, the testimony of the agents who did have familiarity with the case, the statement of the Assistant United States Attorney, and a confidential teletype of September 5, 1975, signed by Enright, in which he acknowledged the grave risk which would result from disclosure of the informer's identity and in which he said that the informer had agreed to supply information only "on condition the identity not be divulged." Additionally, the Drug Enforcement Administration investigative file shows a memorandum on October 10, 1975, in which Agent Baker repeated fears for the personal safety of the informer if the identity be made known.

The casual ease with which the decision to issue a possible death warrant for innocent persons was made by Enright, Farabaugh, Burke, Baker and Cusack is eye opening in light of the agonizing the public, the courts and the press have undergone in facing the question of imposing the death penalty for persons convicted of crimes after the fullest of due process. It was only July 2, 1976, that the Supreme Court upheld the death penalty for a limited group of convicted murderers. *Gregg v. Georgia,* —— U.S. ——, 96 S.Ct. 2909, 49 L.Ed.2d ——, *Proffitt v. Florida,* —— U.S. ——, 96 S.Ct. 2960, 49 L.Ed.2d ——, *Jurek v. Texas,* —— U.S. ——, 96 S.Ct. 2950, 49 L.Ed.2d

——, *Roberts v. Louisiana,* —— U.S. ——, 96 S.Ct. 3001, 49 L.Ed.2d ——.

The DEA Agents Manual directs that disclosure of an informer's identity be avoided whenever possible, and it says that if other more important investigations will be jeopardized, the decision may be to dismiss rather than to disclose. Nowhere in the Manual is there any mention of the possibility of dismissal to avoid breaking a DEA promise to hold secret an informer's employment by the DEA or of a possibility of dismissal to save a life. Sec. 6612.77 of the Agent's manual requires documentation of every contact with an informer. It requires that "Every agent is responsible for insuring that any information derived from a cooperating individual is documented . . . ." I mention this because there is no documentation of certain claimed contacts between the informer and DEA agents which are most important to the resolution of this case. The agents testified to several all important contacts—four or five of them—but none of the vital contacts are mentioned in the investigative file, and what was said at those times is crucial. The promises made the informer may be determinative of an entrapment defense or they may be pertinent to Sixth Amendment violations by the DEA. Why those informer-agent contacts are not reflected in the investigative file was not explained at the hearings which have been held in connection with the motions, and the file suggests almost open defiance of the requirements of the Agent's Manual.

At the hearing of June 10, 1976 [before I had seen the DEA Agents Manual] Agent Farabaugh testified:

"THE COURT: Didn't you make any notes of [contacts with the informant]. That was a very sensitive thing and you are a very experienced law enforcement officer, and, as such, did you make no notes? Do you have no records of the dates and places of the conversations you had [with the infor-

---

**3.** No mention of this telephone conversation nor of the decision to disclose the informer's identity shows up in the DEA file and there is no DEA file record of the call.

mant] and notes of what you told him? You have none of that?

THE WITNESS: No, Your Honor.

THE COURT: You say that you do not have any?

THE WITNESS: No, I have no notes. You mean conferences with the informant?

THE COURT: I mean records of any sort, personal or official at the DEA, do you keep any case notes at all, showing when, where and under what circumstances you talk to the informant and showing the substance of what he said and what. you said.

THE WITNESS: No, Your Honor, I don't have any—

THE COURT: Are there any anywhere?

THE WITNESS: Not to my knowledge, pertaining to this particular subject.

THE COURT: Were there any anywhere?

THE WITNESS: No, sir. Not to my knowledge.

THE COURT: Ever?

THE WITNESS: Not to my knowledge, no sir.

THE COURT: It's not the custom and practice of the DEA to make and maintain such records? What does your case file consist of?

THE WITNESS: It consists of the meetings which lead—meetings with the defendants in the case and subsequent meetings and developments of the case thereafter.

THE COURT: But never any mention of meetings with the informant?

THE WITNESS: No, sir."

Agent Baker testified:

"THE COURT: You realized this was a very sensitive case at the time and you still make no record at all of when you contact an informant or what is said?

THE WITNESS: That's right, Your Honor. [Talks with informers are] just not a necessary part of our reporting system in our opinion or in my opinion."

Regional Director Enright Testified:

"Q. Would [the files] reflect any conversations that took place between the informant and the agents . . . ?

"A. I don't know. I haven't seen the files."

One wonders what the Denver Regional Office of the Drug Enforcement Administration thinks Sec. 6612.77 of the Agent's Manual means.

The motions charge an electronic surveillance of defendant's telephone after she returned to Istanbul following the alleged Denver hand-to-hand sale of heroin to DEA agents, and the motions say that post-arrest there was surveillance of her attorney-client conversations with the Public Defender in his office at the Federal Office Building in Denver, Colorado. There is no question but that defendant's Istanbul telephone was tapped and there is no question that there was intrusion on the attorney-client conferences she had with the Public Defender. This I know from a full evidentiary hearing which resulted in the production of the Drug Enforcement Administration investigative file in the case and the DEA Agent's Manual.

▮ The investigative file, the reporter's transcript of the testimony at the hearings and certain supplementary findings I shall make in this case will be sealed to be opened only on order of Court. I do this because I do not casually risk disclosure of the informer's identity, and I do not choose to accept responsibility for something it has been said will cause probable death of innocent persons. If I were to permit this case to go to trial, disclosure of the informer's identity is required under *Roviaro* and *Martinez*. Should an appellate court later 'say that I should have granted defendant's motion to dismiss, the reversal would not bring back to life persons murdered because of the disclosure of the informer's identity.[4] I

---

**4.** No one suggests that defendant or her friends will kill the informer. The persons who are said to be potential murderers are much higher up in the international drug business than the defendant is accused of being. If guilty, defendant is a courier or mule rather than being a big drug dealer.

think that this case has to be dismissed because of gross misconduct on the part of Drug Enforcement Administration agents, but if the question were much closer than I think it is, I would answer it in favor of saving human life.

■ I am not very concerned about the alleged Fourth Amendment violation because of the telephone tap in Istanbul. Defendant had allegedly already made the Denver sale when her Istanbul phone was tapped, and, except for a possible entrapment defense, the agents had an open and shut hand-to-hand buy to prosecute. The applicability of the Fourth Amendment to conduct of foreign officials in their own countries is discussed fully in *Stonehill v. United States,* (1968) 9 Cir. 405 F.2d 738. As is there noted, "the Fourth Amendment could apply to raids by foreign officials only if Federal Agents so substantially participated in the raids as to convert them into joint ventures between the United States and the foreign officials." The pre-*Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 "silver platter" rule applies, and, although there is some testimony that the DEA was just a lucky beneficiary of the fruits of the wiretap by the Turkish National Police, the record belies that the result was a charitable accident. The investigative file proves that the DEA agents in Istanbul were full partners in the tap which was aimed at trying to nail defendant's source of supply. Documents in the investigative file dated between June 16, 1975, and December 31, 1975, demonstrate a partnership in the electronic surveillance, but it is unlikely that any evidence was obtained necessary to the trial of the hand-to-hand buy case which resulted from the June 14, 1975, sale charged in the indictment. Assuming both the partnership and the applicability of the Fourth Amendment, exclusion of the evidence is all that is required under *Stonehill.*

I need not decide the difficult question of whether the Fourth Amendment affords

protection to a foreign national against illegal searches conducted in a foreign country even if the conduct be as shameful as that alleged in *United States v. Toscanino,* (1974) 2 Cir. 500 F.2d 267. Judge Mulligan's dissent in that case [504 F.2d 1380] says, and I agree:

> "The majority opinion here holds, for the first time and without discernable authority, that the fourth amendment protects a foreign national while residing on alien soil against 'unlawful' searches and seizures; and further that the exclusionary rule (although it is presumably of judicial and not constitutional stature, see *United States v. Calandra,* 414 U.S. 338 [94 S.Ct. 613, 38 L.Ed.2d 561] (1974) ) bars the use on trial of the fruits of the alien's electronic surveillance abroad. The intent or even the power of the Founding Fathers to endow foreign nationals while resident in foreign climes with American constitutional rights is, in my view, a question at least worthy of en banc consideration."

Tapping Guler Orman's telephone in Istanbul was not conduct even approaching the drug agents' alleged shocking misconduct in *Toscanino,* and, indeed, *Toscanino* seems to have been limited by the Second Circuit pretty much to its own facts. See, *United States v. Gengler,* (1975) 2 Cir. 510 F.2d 62, *United States v. Lira,* (1975) 2 Cir. 515 F.2d 68. In any event, defendant's motion to dismiss because of the Istanbul wiretap is denied.[5]

■ I think that there has been no Fifth Amendment violation by way of a "seizure" of defendant's oral communications because of the Istanbul wiretap or the surveillance in the Public Defender's office in Denver. Such is the conclusion of *Andresen v. Maryland,* (1976) —— U.S. ——, 96 S.Ct. 2737, 49 L.Ed.2d ——.

It is the violation of defendant's Sixth Amendment rights after she was extradited, after she appeared before the magistrate, and while she was consulting her

---

**5.** Supposedly the Istanbul wiretap was to identify defendant's source of supply, but the investigative file has repeated references to the identity of the person supplying defendant—references starting as early as May 20, 1975, and threading throughout the file.

appointed lawyer that forces me to the conclusion that there is no alternative to dismissal. I have reached this result reluctantly, because the investigative file says that there was a hand-to-hand buy accomplished by the DEA agents, and I know not whether the eavesdropping on attorney-client conferences is a result of misdirected zeal or if it stems from some other motive.

There was a suggestion by DEA witnesses at the June 10, 1976, hearing that this case was particularly sensitive and that there was State Department pressure to convict the defendant. I expressed curiosity as to why the Department of State would have special interest in the prosecution of a 22-year old girl for selling 500 grams of heroin in the United States, and Regional Director Enright testified that the case had "international ramifications." The record then shows:

> "THE COURT: There's been a suggestion from time to time during the course of these hearings that other agencies of the United States Government were concerned about this case. Can you enlighten me any on that?
>
> "THE WITNESS: Well, I know in any case of this type or when we're dealing with the international drug traffic, the State Department has a great deal of interest, Your Honor.
>
> "THE COURT: All right. You say you know it. Now, did you or to the best of your knowledge, did any representative of the Drug Enforcement Administration talk to any representative of the State Department.
>
> "THE WITNESS: I don't know. I can't answer that. I didn't. I know of nobody that did. . . .
>
> "THE COURT: It has been suggested in this hearing that the State Department does have an interest. Do you know if any inquiry has been made by or on behalf of the Drug Enforcement Administration to find out if the State Department is interested.
>
> "THE WITNESS: No. I would be pleased to do that."

I asked the United States Attorney to make inquiry as to the State Department's interest in this case, if any. He did so. He reported that although the Department of State thinks that when it goes to the trouble to extradite a defendant, a case should not be voluntarily dismissed by the prosecution, the State Department has absolutely no particularized interest in this case, and that there was no State Department pressure to convict this defendant. Thus, State Department pressure does not explain the eavesdropping on attorney-client meetings.

The DEA agents admitted that they communicated advice to the defendant to plead guilty, and I suppose that it is possible that they wanted to find out if she and her attorney were going to go along with that helpful recommendation rather than to try to defend against a hand-to-hand buy to which several agents could testify as eye witnesses. The record suggests that it is also possible that the DEA agents were worried about an affirmative defense of entrapment. The claim was made during the hearing that the DEA learned nothing from the attorney-client intrusion, but there is testimony that they found out that defendant "wasn't telling her lawyers the truth," and there was agent testimony that they learned what the defendant was going to say about:—

> a proposed defense based on sexual activity between—possibly between the agents and the defendant . . . that there would be a charge—or an accusation of sexual liaison of some sort like that . . . (that was) discussed as a prospective defense in this case. . . ."

This intelligence came as no surprise to the DEA, because the record shows that the probability that this "defense would be used was learned shortly after the defendant's arrest in Paris on February 4, 1976." The testimony was:

> "We received information from our Paris office that upon her arrest the defendant made comments that led us to believe that her defense would be entrapment based on a sexual relationship with the agents."

[Once more, the DEA file is deficient in that it contains no record of this warning communique from Paris to Denver to prepare to meet the defense of sexual entrapment allegedly advanced by a 22-year old Turkish National immediately following her arrest in Paris.]

Moreover, Agent Farabaugh testified that he anticipated the defense before receipt of the Paris intelligence.

". . . when you're dealing with a female defendant—an attractive female—a person we know from information from the informant that was often acting in the capacity of a mistress—that would be a natural defense."

The potential of the defense is not lessened by the investigative file which shows expensive and expansive bar hopping by the agents and the defendant as a prelude to the alleged purchase of heroin. In any event, as I shall discuss presently, where there is surveillance of attorney-client conferences, prejudice must be presumed, and by no stretch of the imagination has the DEA here justified its eavesdropping nor has it overcome the strong presumption of that which I think causes incurable prejudice.

I start with the much quoted eloquent statement of Justice Brandeis in *Olmstead v. United States* (1948) 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

I share the concern voiced by Chief Judge Nichol in *United States v. Banks,* (1974) D.C.S.D. 383 F.Supp. 389, 397:

"This court is mindful of the heavy responsibility that it bears in our criminal justice system. It is unquestionably essential to our society that our laws be enforced swiftly and surely. This court also believes, however, that our society is not bettered by law enforcement that, although it may be swift and sure, is not conducted in a spirit of fairness or good faith. Those who break our laws must be brought to account for their wrongs, but it is imperative that they be brought to this accounting through an orderly procedure conducted in the spirit of justice. This court's first duty, then, is to insure that our laws are fairly enforced, or as Mr. Chief Justice Warren aptly put it: '[our duty] is to see that the waters of justice are not polluted.' *Mesarosh v. United States,* supra, 352 U.S. 1 at 14, 77 S.Ct. 1 at 8 [1 L.Ed.2d 1]."

But this post-arrest infringement on defendant's Sixth Amendment rights is solely the making of the Drug Enforcement Administration, and, as is noted in an annotation, *Scope and Extent, and Remedy or Sanctions for Infringement of Accused's Right to Communicate with this Attorney,* 5 A.L.R.3rd 1360, 1365:

"One class of cases in which the courts have had little difficulty in trying to strike a balance between liberty and authority involves 'eavesdropping' on counsel-client conversations, either by electronic devices installed in conference rooms or by means of paid informers who gain access to the privileged communications of the defense. In such instances, courts have not hesitated to rule as unconstitutional and in violation of the attorney-client privilege such underhanded methods of the prosecution."

Undeniably, the two most frequently mentioned cases discussing eavesdropping

on attorney-client conversations are *Coplon v. United States,* (1950) 89 U.S.App.D.C. 103, 191 F.2d 749, and *Caldwell v. United States,* (1953) 92 U.S.App.D.C. 355, 205 F.2d 879. In the first of these cases, Judith Coplon was convicted of furnishing secret United States intelligence reports to a Russian agent, and it was learned that after she was arrested, her telephone conversations with her lawyer were monitored. The Court held that there was presumed prejudice which required a reversal.

"We think the District Court erred in holding that the interception of telephone messages between appellant and her counsel before and during her trial, if it occurred, was nothing more than a serious breach of ethics unless such interception yielded evidence which was introduced against her. It is true, as the court pointed out, that § 605 of the Communications Act, as construed by the Supreme Court, does not make wiretapping an offense but does condemn as criminal the interception and disclosure of the contents of the message, both acts being essential to complete the offense. But that is not analogous to the Fifth and Sixth Amendments, which unqualifiedly guard the right to assistance of counsel, without making the vindication of the right depend upon whether its denial resulted in demonstrable prejudice. The Supreme Court said in *Glasser v. United States,* 1942, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 80: '* * * The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.'

"We think it is further true that the right to have the assistance of counsel is so fundamental and absolute that its denial invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial. In the *Glasser* case, having held that the trial court 'denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amend-

ment', the Supreme Court said: 'This error requires that the verdict be set aside and a new trial ordered as to Glasser.'"

In *Caldwell* the government planted a stool pigeon in the conferences defendant had with his lawyer. This was held to be the equivalent of the telephone tap in *Coplon.*

"On these basic facts, so stated, we think our decision in the *Coplon v. U. S.* case is controlling. We there held flatly that 'The prosecution is not entitled to have a representative present to hear the conversations of accused and counsel.' More specifically, we held that interception of supposedly private telephone consultations between accused and counsel, before and during trial, denies the accused his constitutional right to effective assistance of counsel, under the Fifth and Sixth Amendments. And the denial 'invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial.' We see no reason why intrusion by means of wiretapping should be differentiated from intrusion by means of secret agents. In neither instance, we think, need actual prejudice be shown in order to entitle defendant to a new trial."

I have found no Supreme Court case which rules squarely on the effect of government eavesdropping on attorney-client conversations. Several cases slant at the problem, including *Massiah v. United States,* (1964) 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, *Black v. United States,* (1966) 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26, *O'Brien v. United States,* (1967) 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94, and, most importantly, *Hoffa v. United States,* (1966) 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374. In *Hoffa,* there were two trials, the first of which ended with a hung jury. The second trial resulted in a conviction for jury tampering in the hung jury case [the Test Fleet trial]. Hoffa wanted to have his jury tampering conviction reversed because of intrusion into the attorney-client relationship during the Test Fleet trial, although there

was no claim of attorney-client intrusion in the case in which he was convicted. The Court refused to reverse, and it was said:

"The specific question before us, as framed by counsel for the petitioners, is this:

'Whether evidence obtained by the Government by means of deceptively placing a secret informer in the quarters and councils of a defendant during one criminal trial so violates the defendant's Fourth, Fifth and Sixth Amendment rights that suppression of such evidence is required in a subsequent trial of the same defendant on a different charge.'

·    ·    ·    ·    ·

"The proposition that a surreptitious invasion by a government agent into the legal camp of the defense may violate the protection of the Sixth Amendment has found expression in two cases decided by the Court of Appeals for the District of Columbia Circuit, *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879, and *Coplon v. United States,* 89 U.S.App. D.C. 103, 191 F.2d 749. Both of those cases dealt with government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel. In *Coplon,* the defendant alleged that government agents deliberately intercepted telephone consultations between the defendant and her lawyer before and during trial. In *Caldwell,* the agent, '[i]n his dual capacity as defense assistant and Government agent   .   . gained free access to the planning of the defense.   .   .   . Neither his dealings with the defense nor his reports to the prosecution were limited to the proposed unlawful acts of the defense: they covered many matters connected with the impending trial.' 92 U.S.App.D.C. at 356, 205 F.2d at 880.

"We may assume that the *Coplon* and *Caldwell* cases were rightly decided, and further assume, without deciding, that the Government's activities during the Test Fleet trial were sufficiently similar to what went on in *Coplon* and *Caldwell*

to invoke the rule of those decisions. Consequently, if the Test Fleet trial had resulted in a conviction instead of a hung jury, the conviction would presumptively have been set aside as constitutionally defective. Cf. *Black v. United States,* ante, p. 26.

"But a holding that it follows from this presumption that the petitioner's conviction in the present case should be set aside would be both unprecedented and irrational. In *Coplon* and in *Caldwell,* the Court of Appeals held that the Government's intrusion upon the defendant's relationship with his lawyer 'invalidates the trial at which it occurred.' 89 U.S.App.D.C., at 114, 191 F.2d, at 759; 92 U.S.App.D.C., at 357, 205 F.2d, at 881. In both of those cases the court directed a new trial, and the second trial in *Caldwell* resulted in a conviction which this Court declined to review. 95 U.S.App.D.C. 35, 218 F.2d 370, 349 U.S. 930. The argument here, therefore, goes far beyond anything decided in *Caldwell* or in *Coplon.* For if the petitioner's argument were accepted, not only could there have been no new conviction on the existing charges in *Caldwell,* but not even a conviction on other and different charges against the same defendant.

"*It is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment.* But even if it were further arguable that a situation could be hypothesized in which the Government's previous activities in undermining a defendant's Sixth Amendment rights at one trial would make evidence obtained thereby inadmissible in a different trial on other charges, the case now before us does not remotely approach such a situation."

*Hoffa* is one mentioned by the Supreme Court of *Coplon* and *Caldwell,* and *Lanza v. New York,* (1962) 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384, is another. Certainly the court has not rejected the *Coplon—Caldwell* principle which has been universally recognized by the lower courts which

have had occasion to study the matter. There is some disagreement among lower court decisions as to whether the intrusion must be shown to be "gross" before a reversal is mandated, and as to whether prejudice is presumed. However, I think that the record here shows a "gross" intrusion, and, even if it didn't, I agree with *United States v. Rispo,* (1972) 3 Cir., 460 F.2d 965, which quoted *Chapman v. California,* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." I can make no such declaration here, and as *Rispo* said where it was shown that a sham defendant had been placed in the councils of attorneys and the real defendants:

> "The basic concept of due process is fair play. The test of our system of legal jurisprudence should be measured by the interest we take in safeguarding the fundamental rights of an accused. A defendant is entitled to a fair determination of his guilt. Fair trials insure our concern with due process and contribute to what we believe is the proper administration of criminal justice. It is only in this way that we prevent the undermining and mockery of justice. 'The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law.'"

Other cases condemning surveillance of attorney-client discussions are, *United States v. Rosner,* (1973) 2 Cir., 485 F.2d 1213, *South Dakota v. Long,* (1972) 8 Cir., 465 F.2d 65, *United States v. Zarzour,* (1970) 5 Cir., 432 F.2d 1, *United States v. Banks,* (1974) D.C.S.D., 374 F.Supp. 321, and *United States v. Cooper,* (1975) D.C.Neb., 397 F.Supp. 277, where Judge Urbom discussed most of the cases, and concluded:

> "My analysis of the foregoing cases leads to this: (If the government) [1] gains information, [2] relating to a charge then pending or being investigated, [3] from overhearing conversations by counsel expected to be confidential, and [4] the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge, then there has been a violation of defendant's Sixth Amendment rights to counsel and a new trial is necessary if conviction has followed the divulging."

■ I agree with this analysis, except that I don't think that under the facts of this case there need be disclosure to the prosecutor to taint the proceedings. What was learned by the agents would be of help to them in structuring an answer to the affirmative defense they anticipated, and knowledge on the part of the agents of defense plans and strategy is all I think is necessary to require dismissal. I acknowledge that dismissal is the ultimate sanction not found necessary in the majority of the cases. However, both *Caldwell* and *Hoffa* say that under extreme circumstances, dismissal may be the only solution. Judge Byrne so held in *United States v. Russo and Ellsberg,* No. 9373, C.D.Calif., May 11, 1973, and I agree with *State v. Cory,* (1963) 62 Wash.2d 371, 382 P.2d 1019, 5 A.L.R.3rd 1352, the only case I have found which really talks about what must be done.

> "While our research and that of diligent counsel and amicus curiae have not disclosed a Washington case which speaks of the right of a defendant to confer with his counsel in private, it is universally accepted that effective representation cannot be had without such privacy. The cases are annotated in 23 A.L.R. 1382 and 54 A.L.R. 1225, and numerous citations are listed in the supplements to these annotations.
>
> "It is also obvious that an attorney cannot make a 'full and complete investigation of both the facts and the law' unless he has the full and complete confidence of his client, and such conference cannot exist if the client cannot have the assurance that his disclosures to his counsel are strictly confidential.
>
> "In the case of *Matter of Fusco v. Moses,* 304 N.Y. 424, 107 N.E.2d 581, where an informer had ingratiated himself with other employees charged with neglect of

duty and had attended their conferences with their attorney, the court held that the employees were deprived of their full right to be represented by counsel, and the determination of the administrative body hearing the charges against them was annulled, with the result that they were reinstated in their jobs."

The court then discusses and quotes from *Coplon* and *Caldwell* and the opinion concludes:

"We do not think, however, that the granting of a new trial is an adequate remedy for the deprivation of the right to counsel where eavesdropping has occurred. So far as the opinion in the *Coplon* case reveals, the defendant did not ask that the case be dismissed, but merely urged that she be granted a new trial. In the *Caldwell* case, a footnote indicates that the opinion of the court was that a dismissal would not be proper unless the defendant could show that the invasion of his right to private consultation was so prejudicial that a subsequent trial necessarily would be unfair. In effect, the court in that case said that it was not necessary for the defendant to show that he had been prejudiced in the first trial, in order to secure a second trial, but that it would be necessary to show that he would also be prejudiced in a second trial, in order to secure a dismissal.

"We do not appreciate the logic of this conclusion. There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant's right to private consultation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will

be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy.

. . . . .

" 'It is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens observe the law.'

"This concept of how the judiciary should react to violation of constitutional rights, appeals to us.

"We think that the court in *Fusco v. Moses,* supra, made the only disposition of the case which would afford an adequate remedy to the defendants and effectively discourage the odious practice of eavesdropping on privileged communication between attorney and client. There, the court ordered that the charges against the defendants should be dismissed and that they should be reinstated in their jobs.

"It is our conclusion that the defendant is correct when he says that the shocking and unpardonable conduct of the sheriff's officers, in eavesdropping upon the private consultations between the defendant and his attorney, and thus depriving him of his right to effective counsel, vitiates the whole proceeding. The judgment and sentence must be set aside and the charges dismissed."

I cannot find that the Tenth Circuit has had occasion to discuss listening in on attorney-client consultations, but conversations between drug agents and a defendant, out of the presence of appointed counsel, was condemned in *United States v. Thomas,* (1973) 10 Cir. 474 F.2d 110. In *Thomas,* at least the conversation with the defendant was aboveboard and it did not involve attorney-client privilege. Nevertheless, Judge Seth said:

"What we do hold, however, is that once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney

was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously something which the defendant alone can waive.

.    .    .    .    .

*"The enforcement officials are agents of the prosecuting party,* and in the event use is made of the information secured by interviews of the nature which here took place, short of introduction in evidence, the problem will be dealt with in the proper case. That issue is not here presented."

Just last month the Supreme Court had occasion to remind of the ethical duties of prosecutors, and, although the United States Attorney here has violated no ethical responsibility, he finds that under *Thomas* he is involuntarily saddled with the DEA's conduct and ethical violations. In *United States v. Agurs,* (June 24, 1976) —— U.S. ——, 96 S.Ct. 2392, 49 L.Ed.2d 342, the Court said:

> "For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest 'that justice shall be done.' He is the 'servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.' *Berger v. United States,* 295 U.S. 78, 88 [55 S.Ct. 629, 633, 79 L.Ed. 1314]."

■ The surreptitious eavesdropping on Guler Orman's consultations with her appointed lawyer forces a decision on the problem which was not present in *Thomas*; and, although government counsel has disavowed the conduct of "the enforcement officials (who) are agents of the prosecuting party," I think that the clear invitation of *Thomas* is to deal with the matter by ordering dismissal of the indictment. No order I can frame will protect defendant against prejudice resulting from the reprehensible violation of her Sixth Amendment rights by Drug Enforcement Administration agents.

I can't protect her from improper use of the information acquired through eavesdropping by "the enforcement officials (who) are agents of the prosecuting party." I do not question for a moment the integrity of the United States Attorney, but he is as much in the dark as am I as to the true underlying motive of the DEA agents in surreptitiously listening in on what the defendant was telling her lawyer in supposed confidence and what he was telling her in justifiable belief that the communications were confidential. The United States Attorney has no way to protect and I cannot protect against improper use of that confidential information obtained by DEA through reprehensible and illicit means.

Defendant Guler Orman's motion to dismiss the indictment against her because of gross violation of her Sixth Amendment rights is granted. All parts of the file in the case except (1) the indictment, (2) the pleadings and proceedings under the Speedy Trial Act, (3) the order for subpoenas, (4) the motion to dismiss, (5) the arrest warrant and proceedings before the magistrate, (6) matters having to do with defendant's extradition from France, and (7) this opinion, shall be sealed to be opened only on order of court. The Drug Enforcement Administration files delivered to the Court for *in camera* inspection shall be sealed to be opened only on order of court. If the Drug Enforcement Administration desires a copy of its files, a copy may be supplied to it, the copy to be made under the direct supervision of the United States Attorney's office.

Defendant's bond is exonerated and her passport shall be returned to her.