The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Jennifer REALI, Defendant–Appellant.

No. 93CA0619.

Colorado Court of Appeals,
Div. III.

Oct. 20, 1994.

As Modified on Denial of Rehearing
Nov. 25, 1994.

Certiorari Denied May 8, 1995.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Roger G. Billotte, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Elvin L. Gentry, P.C., Elvin L. Gentry, Marla Prudek–Wyatt, Colorado Springs, for defendant-appellant.

Opinion by Judge CRISWELL.

Defendant, Jennifer Reali, appeals from the judgment of conviction entered on a jury verdict finding her guilty of first degree murder and conspiracy to commit first degree murder. Among other assertions of error, she argues that her convictions were obtained through the improper use of immunized testimony that she gave in another case and of privileged information that the trial court improperly required her counsel to produce. Because we conclude that the matters complained of, even if arguably erroneous, constituted only harmless error, we affirm.

Brian Hood and the defendant had been having a sexual liaison for several months prior to the killing upon which the charges were based. The victim was Brian Hood's wife, who was fatally shot by defendant on September 12, 1990, after leaving a lupus support group meeting.

Within two days after the shooting, defendant gave a detailed confession of the crime to investigating officers. In summary, this statement described how she had become involved with Hood who convinced her, by various religious arguments, to kill his wife. It further described various aborted murder plans and concluded with a description of how she had put on men's clothes and a ski mask, given to her by Hood, and shot the victim.

Presumably because of the existence of this detailed inculpatory statement, defense counsel adopted a strategy designed to persuade the prosecutor not to seek the death penalty while, at the same time, preserving defendant's right to assert all available defenses. In pursuit of this strategy, shortly after the filing of the charges, counsel authorized the defense investigator to provide certain information to the prosecution, and the investigator, with counsel's approval, continued to provide other information throughout the pendency of the charges.

In addition, in late November 1990, the prosecution and the defense entered into an express agreement in which defendant agreed to cooperate in the prosecution of Hood for his part in the killing, including testifying before the grand jury and at his trial pursuant to a grant of use immunity for such testimony. In return, the prosecution agreed not to seek the death penalty in defendant's case and also agreed that, should defendant be convicted and should there be a commutation petition filed with the Governor, the prosecution would favorably comment to the commutation board as to the nature and extent of defendant's cooperation.

Pursuant to this agreement, defendant testified before the grand jury that later indicted Hood, at a hearing upon Hood's request for release upon bond, and at his trial. He was convicted of conspiracy to commit first degree murder and two counts of criminal solicitation. *See People v. Hood,* 878 P.2d 89 (Colo.App.1994).

The record establishes that the same individuals in the prosecutor's office who were charged with investigating and prosecuting the charges against Hood were also the persons who investigated the charges against defendant and later prosecuted her. Thus, counsel who presented defendant's immunized testimony against Hood in his trial and who were, therefore, fully familiar with that testimony, were the same individuals who later presented the People's case against defendant in her trial.

Defendant's immunized testimony in the Hood proceedings was not materially different from the statements made by her in her earlier detailed confession. However, in her later testimony, she expanded upon some of the subjects addressed in her prior statement and provided further details that had not been disclosed in that statement.

Defendant pleaded not guilty by reason of insanity pursuant to § 16–8–103, C.R.S. (1986 Repl.Vol. 8A), and her sanity trial was held after she testified before the grand jury and in Hood's bond hearing, but before her testimony in Hood's trial. At her sanity trial, a substantial amount of evidence was received relating to the events leading up to the crime and to the crime itself. She was found to be sane.

After her sanity trial, but before Hood's trial, the court before which the charges against Hood were pending, relying upon the decision in *State v. Von Bulow,* 475 A.2d 995 (R.I.1984), held that the disclosures made through defendant's counsel to the prosecution caused defendant to waive her attorney-client privilege. Counsel was ordered, therefore, to turn over to Hood's counsel his entire file on the case (excluding certain excisions made by the court after an *in camera* examination). And, because Hood's counsel had access to these materials, Hood's prosecutors, who were also simultaneously prosecuting defendant, were also given access to them.

Later, the trial court here determined that the order of the court requiring a turnover of counsel's files was entered in error. Al-

though the trial court denied defendant's motion to dismiss the charges as a remedy for this improper turnover, it directed that the prosecution was not to make use of any information obtained by it after defendant's sanity trial.

Defendant, in addition to raising the issue of her insanity, also raised the affirmative defense of impaired mental condition pursuant to § 16–8–103.5(1), C.R.S. (1986 Repl.Vol. 8A), and prior to the guilt phase of her trial, she supplied the prosecution with the names of the witnesses she intended to call with respect to this defense and with the other information required to be disclosed by § 16–8–103.5(4), C.R.S. (1994 Cum.Supp.).

## I.

█ Defendant first argues that her confession was inadmissible because she was not given a proper advisement of her rights and because her request for counsel was ignored. We disagree.

First, the trial court determined, as a fact, that defendant's statements to investigators prior to her arrest did not result from a custodial interrogation, and in any event, she had received a proper prior advisement. Such finding has record support and, therefore, will not be disturbed on appeal. *See People v. Hamilton*, 831 P.2d 1326 (Colo. 1992).

Further, after being advised of her rights again and being reminded of that advisement on several occasions, defendant was given a further, full advisement. When defendant asked whether she should have counsel before making a formal statement, she was again told that she had a right to counsel, that if she wanted counsel the interview would cease, and that it would resume again only if counsel approved. She then expressly waived her right to counsel and continued to speak with the officer.

We agree with the trial court that the interrogation here did not violate the mandate set out in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and that defendant's right to counsel was not denied. *See Davis v. United States*, ⸺ U.S. ⸺, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994);

*People v. Benjamin*, 732 P.2d 1167 (Colo. 1987).

## II.

█ Defendant next contends that her Fifth Amendment right not to be a witness against herself was violated by the prosecution's improper use during her trial of the immunized testimony that she gave during the course of the Hood proceedings. While we agree that the prosecution's actions in this case, if not clearly erroneous, were undertaken without a full consideration of the manner in which those actions could have an impact upon defendant's rights, we nevertheless conclude that, under the unique circumstances presented here, no prejudicial error occurred.

In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the United States Supreme Court upheld the constitutionality of a statute that authorized the compulsion of testimony under a grant of immunity which provided that neither the testimony compelled, nor any information directly or indirectly derived from such testimony, could be used against the witness. In holding that, under a grant of such use immunity, the compulsory testimony did not violate the witness' Fifth Amendment privilege, the court emphasized that the immunity granted was "co-extensive" with and was as "comprehensive as the protection afforded by" the privilege. *Kastigar v. United States*, 406 U.S. at 449, 92 S.Ct. at 1659, 32 L.Ed.2d at 219.

The Colorado statute pursuant to which defendant was granted immunity here, § 13–90–118, C.R.S. (1987 Repl.Vol. 6A), contains essentially the same provisions as those considered in *Kastigar*. *See People v. Lederer*, 717 P.2d 1017 (Colo.App.1986).

In *Kastigar*, the supreme court determined that the statute there prohibited "the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insure[d] that the testimony [could] not lead to the infliction of criminal penalties on the witness." *Kastigar v. United States*, 406 U.S. at 453, 92 S.Ct. at 1661, 32 L.Ed.2d at 222 (original emphasis). It further stated

that any statute that does not provide such "a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom," cannot withstand a constitutional challenge. *Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. at 1664, 32 L.Ed.2d at 226.

In addition, the *Kastigar* court concluded that, once a criminal defendant demonstrates that he has been compelled to testify under a grant of use immunity, the prosecution then has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. at 1665, 32 L.Ed.2d at 226. *See also Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (similar rule applied to prosecution in federal court of defendant granted transactional immunity by state).

■ Under *Kastigar*, therefore, it is clear that neither the immunized testimony itself, nor any other information or person discovered as a result of that testimony, may be used against the witness. And, indeed, to the extent that another person has been exposed to the immunized testimony, the testimony of that other person may be so "tainted" that it would be a violation of the defendant's rights to make use of that person's testimony. *See United States v. Poindexter*, 951 F.2d 369 (D.C.Cir.1991); *United States v. North*, 920 F.2d 940 (D.C.Cir.1990).

Some courts, however, have interpreted *Kastigar* more broadly than as merely prohibiting an *evidentiary* use (either direct or indirect) of the immunized testimony. In *United States v. McDaniel*, 482 F.2d 305 (8th Cir.1973), for example, the federal court noted that, if a prosecutor has access to a defendant's immunized testimony, the knowledge gained from such access can be used by that prosecutor for any number of non-evidentiary purposes, such as preparing for cross-examination, interpreting evidence, or generally planning trial strategy. Absent the compulsion resulting in the immunized testimony, if a defendant relied upon his or her Fifth Amendment privilege, the prosecution would not have any such advantage. Hence, the *McDaniel* court concluded that a prosecu-

tor's mere knowledge of the immunized testimony is itself a "use" of that testimony, and proof of such knowledge constitutes prima facie proof of its improper use under *Kastigar*. To essentially the same effect, *see United States v. Semkiw*, 712 F.2d 891 (3d Cir.1983); *State v. Munoz*, 103 N.M. 40, 702 P.2d 985 (1985).

Other courts have rejected the notion that the mere exposure of a prosecutor to immunized testimony constitutes an improper use of that testimony absent a further demonstration of the prosecution's evidentiary use of it. *See United States v. Rivieccio*, 919 F.2d 812 (2d Cir.1990); *United States v. Palumbo*, 897 F.2d 245 (7th Cir.1990); *United States v. McGee*, 798 F.Supp. 53 (D.Mass.1992); *People v. Gwillim*, 223 Cal.App.3d 1254, 274 Cal.Rptr. 415 (1990). *See generally* Gary S. Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment*, 66 Tex.L.Rev. 351 (1987).

Our supreme court appears to have accepted the *McDaniel* analysis. In *People v. Casselman*, 196 Colo. 304, 583 P.2d 933 (1978), local prosecutors attended a bankruptcy hearing at which the defendant testified pursuant to the bankruptcy immunity statute. The same prosecutors then prepared a criminal charge against the defendant. Relying upon *McDaniel*, the supreme court determined that the prosecutors' "extensive exposure" to defendant's immunized testimony made it "highly improbable that the prosecution did not make some use of the testimony" and concluded that proof of such "participation by the district attorney and his staff at the bankruptcy hearing constituted prima facie [proof of the] use of the defendant's immunized testimony...." *People v. Casselman*, 196 Colo. at 307, 583 P.2d at 935–936. *Cf. People v. Manning*, 672 P.2d 499, 513 (Colo.1983) (suppression proper for statement given under promise of immunity and "any evidence derived directly or indirectly" from defendant's statements).

Further, even those courts that have rejected the assertion that a prosecutor's mere exposure to immunized testimony constitutes an invasion of a defendant's Fifth Amendment rights have emphasized the necessity for prosecutors to refrain from voluntarily

exposing themselves to such information. Those who are possessed of knowledge of the testimony should be isolated from those charged with the witness' prosecution. *See United States v. Schwimmer*, 882 F.2d 22 (2d Cir.1989); *United States v. Byrd*, 765 F.2d 1524 (11th Cir.1985).

■ Here, it is undisputed that both the investigators and the prosecutors who were involved in the prosecution of Hood also were charged with investigating and prosecuting defendant. There was no attempt to withhold defendant's immunized testimony from her prosecutors, and at least one prosecutor testified that, having read her immunized testimony, he found it impossible to put it out of his mind.

Nevertheless, we do not consider the *Casselman* decision to be dispositive of defendant's claim here for at least two reasons.

First, while the *Casselman* court appears to have adopted *McDaniel's* analysis, nevertheless, the prosecution there actually used the information disclosed in the bankruptcy hearing to prepare the state charges. Thus, there was a demonstrable use made of the immunized testimony in *Casselman* beyond the prosecutor's mere knowledge of that testimony.

Second, and perhaps more significant, defendant here made a detailed, non-immunized statement describing her part in the killing before giving any immunized testimony, and the prosecution was in legitimate possession of the information provided by that statement. In addition, her counsel provided additional information to the prosecutors that was not referred to in her previous statement. Hence, only to the extent that defendant's later testimony in the Hood proceedings provided to the prosecution information not previously supplied by her may it be said that the prosecutor's knowledge of that immunized testimony constituted an improper use of it.

Further, at least within the context of the particular circumstances presented here, we do not consider that the possible use by the prosecutor of some of the additional information provided by the defendant in her immunized testimony was a "structural defect"

in the trial itself any more than the use of some other coerced statement would constitute such a defect. And, the admission of coerced statements is not such a structural defect. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Luu v. People*, 841 P.2d 271 (Colo.1992).

Therefore, even if, in the proceedings against defendant, the prosecution did make use of some of the information contained in defendant's immunized testimony, beyond that previously supplied or discovered from another independent source, a harmless error analysis is appropriate. *Arizona v. Fulminante, supra*. Under such an analysis, any use of immunized information would be considered to be prejudicial error, unless it can be demonstrated, beyond a reasonable doubt, that such use did not contribute to her conviction. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *People v. Naranjo*, 840 P.2d 319 (Colo.1992).

■ In conducting such an analysis, it is important to recognize that the fact of the victim's shooting by defendant was not only described by her in her confession, but that fact was not seriously contested at her trial. Rather, aside from the question of her sanity, which was presented at her sanity trial, the only question of substance presented was whether, at the time of the killing, defendant suffered from such an impaired mental condition that she was incapable of forming the requisite intent.

However, considering the substantial knowledge that the prosecutors had gained of the nature of defendant's defense from her confession, from the other information supplied by her counsel, and from the materials relating to her defense of impaired mental condition, which she was required, by statute, to supply to them, there has been no suggestion as to how the prosecutors could have used their knowledge of her immunized testimony to their advantage. *See* § 16–8–103.5, C.R.S. (1986 Repl.Vol. 8A).

Nevertheless, in addition to her assertion that there was a general, non-evidentiary, use of her immunized testimony resulting from the prosecutor's knowledge of that testimony, defendant also asserts that there

were four instances in which the prosecution made use of information gained from her immunized testimony to present witnesses or argument at her sanity trial or at her trial on the merits.

■ First, in defendant's confession she asserted that the ski mask that she wore was given to her by Hood. However, it was evident that this mask had been hand-sewn to reduce the size of the openings for the eyes, nose, and mouth, and during her testimony before the grand jury, she testified that she sewed the holes in the mask to reduce their size to make it more difficult to identify her.

Then, during closing argument in the trial of defendant's guilt, the prosecutor noted that someone had sewn the mask and asserted that defendant had sewn the mask prior to the day of the killing. Defendant asserts that this information came to the prosecutor only as a result of defendant's grand jury testimony. We disagree.

The record reveals that, some time before the parties entered into the agreement by which defendant was granted use immunity, the defense investigator, with counsel's approval, met with an investigator for the prosecution. At that time, the prosecution was informed that it was defendant who had sewn the mask's openings to reduce their size.

Therefore, even if we were to assume that it could not reasonably be inferred, in any case, that it was defendant, who admittedly was in possession of this mask before the killing, who was the one who sewed it, information respecting this subject came to the prosecution prior to defendant's immunized testimony and from a source independent of that testimony. The prosecution's argument, therefore, did not result in any improper use of defendant's immunized testimony.

■ Second, when defendant testified at the Hood bond hearing, a sales person for a local retail shop was present as a prospective witness for Hood. This person had previously tentatively identified defendant and another individual as looking "similar" to an individual who had purchased a ski mask from her shortly before the killing. She testified that, while nothing that defendant said in her testimony influenced her, nevertheless, when she saw defendant in person at this bond hearing, she became convinced that defendant was the one who purchased the mask from her. Later, in defendant's sanity trial, this witness testified to defendant's purchase of the ski mask. Defendant continued to deny her purchase of the mask and to insist that the mask was given to her by Hood.

The trial court determined that this witness' testimony had been tainted by her observation of defendant at the Hood bond hearing and prohibited the prosecution from calling this witness in the guilt phase of defendant's trial. However, it refused to set aside the verdict in defendant's sanity trial. Based on the undisputed facts, however, we do not agree with the trial court's characterization of this witness' testimony as being tainted.

The record establishes that none of defendant's testimony influenced this witness. On the contrary, defendant denied the witness' allegation that defendant bought a ski mask. Rather, the only feature that the witness relied upon in identifying defendant as the purchaser of the mask was her physical appearance and, possibly, the sound of her voice. Hence, it was not defendant's testimony, as such, but her mere physical presence at the bond hearing that was the cause of any possible "taint" of the witness' testimony.

Yet, the privilege against self-incrimination does not extend to non-testimonial actions. Defendant could have been compelled to appear before this witness and to speak even in the absence of the grant of use immunity. *People v. District Court*, 187 Colo. 333, 531 P.2d 626 (1975) (compelling defendant to appear in lineup and give speech sample does not violate privilege against self-incrimination); *People v. Portley*, 857 P.2d 459 (Colo. App.1992) (same).

Thus, the mere fact that the witness observed defendant at a hearing in which she gave immunized testimony does not, in our view, constitute either a direct or indirect use of that testimony.

■ Third, defendant alleges that the prosecution presented the testimony of the daughter of defendant's baby sitter at both

her sanity trial and at her trial on the merits and that such testimony was discovered as a result of defendant's immunized testimony. The record does not support this assertion.

In defendant's original statement, she informed the investigating officers that, after the killing, she picked up her children from her baby sitter. Contemporaneous police reports demonstrate that the baby sitter was interviewed within a week thereafter, and she told the investigators that her daughter was the one who was present when defendant arrived and that her daughter had said that defendant had presented a normal appearance. The identity of this witness and the substance of her testimony were, therefore, discovered by the prosecution long prior to defendant's first immunized statement.

Further, this witness testified only to defendant's appearance and demeanor when she picked up her children. Nothing in her testimony suggests that it was influenced by anything said by defendant in her immunized testimony.

 Finally, defendant claims that the prosecutors in the sanity trial somehow took advantage of their knowledge that defendant had very poor eyesight and that she was left-handed, which they learned through her grand jury testimony. Again, however, the record does not support this assertion.

Defense counsel, in his opening statement to the jury in the sanity trial, revealed that defendant had poor eyesight and was left-handed, but that the person who shot the victim used her right hand and wore no glasses. We can discover no use by the prosecution of these facts.

In short, therefore, while this record reveals that the prosecutors and their investigators had full access to defendant's immunized testimony, it also affirmatively establishes that there was no direct or indirect evidentiary use made of that testimony. Given this record, moreover, which reflects that the prosecution was provided with substantial information from defendant that was not subject to any immunity and that the relevant statutes required defendant to disclose the nature of her defenses to the charges and the evidence in support of those defenses, we are convinced beyond a reasonable doubt that the prosecutors' mere knowledge of her immunized testimony here did not result in any prejudice to her.

## III.

 Defendant also asserts error with respect to the Hood court's order requiring her counsel to turn over to Hood's counsel and to her prosecutors his entire file (subject to certain excisions made by the court *in camera*). She contends that such order constituted a fundamental breach of the attorney-client privilege and thereby denied her the right to effective assistance of counsel under the Sixth Amendment. While we will assume that such turnover order was erroneous, *see In re Von Bulow*, 828 F.2d 94 (2d Cir.1987), we conclude that the court's later order, which was designed to remedy this alleged error, was sufficient to render the former order harmless.

We note, first, that the turnover order was sought, not by the prosecution, but by counsel for Hood and that defendant's prosecutors became aware of defense counsel's files, as excised, only because the Hood prosecutors were obviously entitled to review the materials delivered to Hood and Hood's prosecutors were also defendant's prosecutors. Thus, had the prosecution here taken steps to separate the two prosecutorial functions, as the prior jurisprudence suggests it should have, there could have been no claim made by defendant that the turnover order in the Hood proceedings resulted in some prejudice to her during the course of her prosecution.

 However, even in the instance of deliberate governmental interference with the attorney-client relationship, dismissal of the charge is not mandated, absent demonstrable prejudice. Rather, any remedy for such interference should be tailored to compensate for the injury suffered. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). *Cf. United States v. Orman*, 417 F.Supp. 1126 (D.Colo. 1976).

Here, the turnover order was entered several months after defendant's sanity trial, so the issues litigated there could not have been

affected by that order. Further, while defendant complains that the files required to be turned over contained defendant's and counsel's mental impressions and notes, there is no claim that there was any specific *information* contained within those files of which the prosecution was not previously aware.

Moreover, the pertinent statute, § 16–8–103.5, required defendant to disclose the nature of her defense of impaired mental condition, as well as the nature of the evidence to be presented in support of that defense. We cannot, therefore, determine, and defendant has not described, any specific prejudice that allegedly resulted from the prosecutor's knowledge of those files.

The trial court ordered that the prosecution was to present no information in the guilt phase of defendant's trial of which it was not aware at the time of her sanity trial. Absent a demonstration that there was a violation of that order or that there was some specific prejudice otherwise resulting from the prosecution's prior knowledge of defense counsel's file, we cannot say that defendant was entitled, as a matter of law, to a dismissal of the charges or that the trial court's order restricting the prosecution was not an appropriate remedy under the circumstances.

### IV.

Defendant finally asserts that she is entitled to a reversal of her conviction and to an order directing a new trial upon the issue of her guilt because of various remarks made by the prosecutor in the presence of the jury. While we agree that several of the remarks made were inappropriate, and in several instances unprofessional and improper, we conclude that they were not sufficiently prejudicial to warrant a reversal of the judgment.

■ In one instance, in expanding upon an objection that he was making to a question posed by defense counsel, the prosecutor, in what he later characterized as a "slip of the tongue," started to refer to "a person who hasn't even testified"—an obvious reference to defendant. Before he could complete this sentence, however, he was interrupted, and out of the presence of the jury, defendant moved for a mistrial or for a dismissal of the charges.

The court denied both motions, noting that the jury had already been instructed upon defendant's right to remain silent and that it intended to instruct the jurors upon the subject again in its final charge. It also offered to give an immediate special instruction upon the subject, but the defense stated that it would "stand on the record" and leave it to the court's preference. No special instruction was given at that point, nor was any further reference made by counsel to defendant's silence.

■ Not every reference to a defendant's silence mandates reversal; reversible error occurs only if the jury's attention is directed to a defendant's exercise of the right not to testify and defendant's silence is used to infer guilt. *People v. Key,* 185 Colo. 72, 522 P.2d 719 (1974); *People v. Abeyta,* 728 P.2d 327 (Colo.App.1986).

■ Further, a motion for a mistrial is directed to the trial court's sound discretion, and its determination of the question will be reversed only if it abuses that discretion. *People v. Saars,* 196 Colo. 294, 584 P.2d 622 (1978); *People v. Benevidez,* 679 P.2d 125 (Colo.App.1984). Given the circumstances, this record reveals no such abuse.

■ Defendant also asserts that one of the prosecutors was guilty of misconduct because of the form of numerous objections which he made to the testimony of a defense expert. Typical of the comments made by the prosecutor in objecting to portions of the testimony of the expert witness are the following:

> People object to this as outside what she was qualified as an expert in. No such thing as mind control in the DSM III [*i.e.,* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (3d ed. 1980) ], outside what she's qualified as an expert in. This is just talking in confusion, what they're doing now.
>
> . . . .
>
> [T]here is no scientific studies, no scientific reliability to this particular theory of mind

control ... She's been qualified in the field of psychology not in the field of mind control, if there is such a thing. As far as the People are aware, there is no such thing in the field of psychology. This person is making it up, and she's making it up....

. . . .

Your Honor, the People object to that example. Anybody knows that you should drive careful over loose sand. Has nothing to do with conditioned response.

. . . .

You know, she's a psychologist, not a psychiatrist. Psychiatrists are the ones that deal with chemical imbalance of people not psychologists.... Not even their field, not even close. In allowing this person ... to testify to those types of things, is just wrong....

There is no subcategory [referring to the expert's reference to the battered woman syndrome as a subcategory of post-stress disorder]....

She is testifying to a new theory she's just made up here from some tests she's done.

Many of the objections made by the prosecution, which were overruled by the court, had no legal basis and appear, on their face, to have been designed solely to comment upon the credibility and weight of the witness' testimony. We agree with defendant that this type of conduct is inappropriate, unwarranted, and unprofessional, and a trial court should not tolerate it.

Nevertheless, we conclude that these comments, either singly or collectively, did not deny the defendant a fair trial or result in any substantial prejudice to her. The trial in the guilt phase of the case took more than a month's time, during the course of which there were over 50 witnesses presented, and the jurors deliberated for five calendar days before returning their verdict.

Given these circumstances, we are convinced that the various remarks complained of by the defendant, while they were improper, were not the source of any prejudicial error. *See People v. Hood, supra.*

Judgment affirmed.

DAVIDSON and TAUBMAN, JJ., concur.