UNITED STATES of America

v.

Vivian PHILLIPS and Esther Phillips.

UNITED STATES of America

v.

Mark POPOVICH and Nina Popovich.

UNITED STATES of America

v.

Frank J. RUSSELL.

UNITED STATES of America

v.

Carl J. SEDLMAYR, Jr.

Nos. 79–48 CR–T–H, 79–49 CR–T–K, 79–50 CR–T–H and 79–51 CR–T–K.

United States District Court,
M. D. Florida,
Tampa Division.

Oct. 26, 1979.

425

Wilmer Parker, III, Special Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

P. D. Aiken, Fort Lauderdale, Fla., Arnold D. Levine, D. Frank Winkles, Tampa, Fla., William R. Bagby, Lexington, Ky., B. G. Stephenson, Arlington, Va., George W. Ericksen, and Claude H. Tison, Jr., Tampa, Fla., for defendants.

ORDER ON MOTIONS TO SUPPRESS

HODGES, District Judge.

These cases are before the Court on motions to suppress filed by the Defendants seeking an order excluding from evidence the fruits of a search conducted by Canadian authorities in Edmonton, Alberta, Canada on July 24, 1975. The four cases were consolidated for the limited purpose of conducting joint proceedings on the motions, and an evidentiary hearing was held before me on August 6 through August 9, 1979. Prior to the hearing the parties had presented to the Court their respective memoranda, and the Court has since received supplemental briefs. It is appropriate, therefore, to now make the following findings of fact and conclusions of law concerning these motions.

FINDINGS OF FACT

1. The Defendant, Carl J. Sedlmayr, Jr., was during 1975 the President of Royal American Shows (R.A.S.) one of the largest traveling carnival shows in North America. R.A.S. travels from city to city in the United States and Canada using its own train

and equipment. During the 1975 Canadian summer circuit, the carnival traveled to Winnipeg, Calgary, Edmonton and Regina in Western Canada.

2. The Defendants, Vivian and Esther Phillips, Mark and Nina Popovich, and Frank Russell, are independent concessionaires who were associated with R.A.S. Each of these Defendants, except Mark Popovich, traveled with R.A.S. during the 1975 Canadian summer circuit. As independent concessionaires they owned their own equipment, purchased their own supplies and made various payments to R.A.S. for transportation about the carnival circuit and for the right to conduct business on the carnival midway set up by R.A.S. pursuant to contract with fair or exhibition authorities in each city. They lived in their own trailers on the exhibition grounds or in rented cars aboard the R.A.S. train.

3. On July 24, 1975, from about 2:00 A.M. to 6:00 A.M., while the carnival was playing in Edmonton, Alberta, a force of approximately 139 officers of the Edmonton City Police (E.C.P.) and the Royal Canadian Mounted Police (R.C.M.P.) made a "raid" upon the fairgrounds for the purpose of conducting a massive search pursuant to judicially issued warrants. Trailers and train cars used as personal residences and/or business offices by the Defendants were searched and a large number of documents were seized. A United States Internal Revenue Agent was later permitted by Canadian officers to copy some of those documents, and the Defendants now seek to suppress them.

4. In 1974 Canadian criminal intelligence information accumulated by the R.C.M.P. indicated that certain individuals believed to be associated with the carnival industry were transporting large amounts of cash from cities in Western Canada, where R.A.S. and other carnivals were playing, to Vancouver, British Columbia, and ultimately into the United States. Airport squads of the R.C.M.P. detected persons carrying this money in hand baggage. Among the so-called "bagmen" were Benjamin Henry Mayers, William Percival Goggins and Walter Stokes. Canadian authorities determined that Mayers was an officer of Specialty Manufacturing, Ltd. of Vancouver and associated with Ace Novelty Co. of Seattle. Goggins was also known to have connections to Specialty Manufacturing. R.C.M.P. officers suspected that the money originated with R.A.S. and was derived from "skimming" operations on the midway in violation of Canadian tax laws, or from drug dealings or other criminal activities. However, the specific connection of these individuals with R.A.S. was not known. Much later it was determined that they were in fact involved in the sale of plush toys to carnivals and various independent concessionaires.

5. During these investigative activities in 1974 Canadian and United States authorities exchanged considerable information concerning the individuals involved. In particular, memoranda were exchanged between the R.C.M.P. and the I.R.S. Intelligence Division in Seattle. On one occasion, on June 29–30, 1974, acting on a tip received from Canadian officers, Special Agent Stan Lovell and another agent of the Seattle I.R.S. office surveilled Mayers and Goggins in Vancouver prior to Mayers' entry into the United States. However, Agent Lovell testified at the suppression hearing that he did not go to Canada to assist Canadian authorities but that he was concerned only with possible violations of the tax laws of the United States.

6. Also during the summer of 1974, Sgt. Douglas, Egan, R.C.M.P., then stationed in Saskatchewan, investigated allegedly fraudulent carnival activities in that province. He reported to his superiors that about 40 games were detected on the midways of various carnivals, including R.A.S. in Regina, which he believed to be fraudulent or otherwise in violation of the Canadian criminal code. He also reported other illegal activities in which he believed carnival operators or employees were engaged. However, there is no evidence to indicate that United States officials cooperated or assisted in this investigation or that they were informed of the results.

7. In 1975, Canadian authorities continued their investigation of carnival operations in Western Canada. A copy of Egan's report of his 1974 investigation was forwarded to Inspector Graham George, R.C. M.P., liaison officer in Western Canada for the Criminal Intelligence Service (an organization of various Canadian law enforcement agencies). On May 13 and 14, 1975 in Regina a "task force" was formed consisting of representatives from several Canadian governmental agencies including the R.C.M.P., the Canadian tax agency known as the Department of National Revenue (D.N.R.), and local police forces. The force was organized for the purpose of a concentrated investigation of the carnival industry and R.A.S. was selected as the primary target of the investigation because it was the largest carnival operating in Western Canada.

8. The specific purpose of the task force was to investigate whether the Exhibition Boards in various cities which rented fairgrounds to R.A.S. were being defrauded, whether midway games were fraudulently operated and whether income taxes were being evaded.

9. Since no law enforcement officials in Canada had expertise in carnival operations the task force sought advice from state or local law enforcement authorities in Arizona or California concerning the nature of the carnival business. However, there is no evidence to indicate that any U. S. agency requested Canadian officials to investigate the carnival industry in Canada or that any U. S. agency suggested the formation of a task force for that purpose.

10. The task force investigated R.A.S. during its 1975 engagements in Winnipeg, Calgary, Edmonton and Regina.

11. Task force members observed activities by the "bagmen" in 1975 similar to those noted in 1974. On June 16, 1975, someone with the R.C.M.P. telephoned the I.R.S. office in Seattle and requested assistance in securing a list of motor vehicles registered in the State of Washington to Benjamin Mayers or Ace Novelty Co. On June 18 Special Agent Lovell supplied that information by telephone (apparently without inquiry as to the reason for the request). On June 26 in Winnipeg Benjamin Mayers and James Breen were seen by the R.C.M.P. leaving for Vancouver carrying $30,000. On July 12, William Goggin and James Breen presented $70,000 to the R.C. M.P. airport detachment in Calgary for a private inspection for flight clearance. The airport detachment noted the license number of the car used by the two men and passed the information on to the task force.

12. The R.A.S. carnival left Calgary for Edmonton on July 14, 1975 followed by the Task Force. Inspector Erhard Hahn, who commanded the Morality Division of the E.C.P., worked with the task force in Edmonton. On July 21, Hahn organized a raid in Edmonton upon tents housing a game known as the "Nickel Diggers." The "Nickel Diggers" were determined to be owned by Casper Bellino, an independent concessionaire, and officers obtained and executed that evening a warrant upon his trailer. The searching officers seized documents which were then examined by Edmund Swartzack, the D.N.R. representative on the task force. Swartzack formed the opinion from the accounting records and tax returns that there was a 40% under reporting of income.

13. Contemporaneously, on July 15, 1975, the task force sought an authorization to intercept private communications under the Canadian Protection of Privacy Act, Part IV–1, Criminal Code of Canada, § 178.1 et seq. Similar to the corresponding United States Act, 18 U.S.C. § 2510 et seq., the Canadian statute provides for judicial approval and supervision of wiretaps, and for exclusion of evidence obtained in violation of the Act. The authorization, granted by Judge Wachowitz in Edmonton, specified that private communications over three R.A.S. telephones on the Edmonton fairgrounds could be intercepted with respect to the offenses of theft, fraud and conspiracy under the Criminal Code. Authorization was also given to intercept any oral or wire communication in any hotel room or other similar accommodation in Edmonton

that William Percival Goggin, James Breen, Benjamin Mayers or Walter Stokes might occupy.

14. On July 19 or 20, 1975, a task force officer noticed that the car which Breen and Goggins had driven to the Calgary airport was parked at the Edmonton Plaza Hotel and that the hotel register listed a James Breen of Seattle in Room # 519, and an L. A. Breen of Seattle in Room # 716; and, accordingly, pursuant to the authorization, a listening device and wiretap were each placed in rooms # 519 and # 716 of the Edmonton Plaza Hotel and conversations were monitored.

15. Officers monitoring the conversations soon discovered that the occupant of Room # 519 was in fact the defendant Mark Popovich, not James Breen. Popovich had not entered Canada with the carnival for the 1975 season presumably because a Canadian arrest warrant for operation of an allegedly fraudulent game in Regina during 1974 was still outstanding against him. The occupant of Room # 519 made frequent calls to a trailer on the R.A.S. midway occupied by the Defendant Nina Popovich. Apparently Mark Popovich was using the name of James Breen to direct the operation of his concessions without attracting official attention.

16. Mark Popovich left Edmonton for Chicago on July 22, 1975, after which task force officers decided to move the telephone intercept to the telephone in the Nina Popovich trailer on the fairgrounds. As subsequently noted, it seems that this movement or transfer, and the interceptions that followed, were not within the purview of the earlier judicial authorization, but the officers apparently believed in good faith that it was. On July 23, officers intercepted and recorded a conversation between Mark Popovich in Chicago and Nina Popovich in the trailer. The conversation suggested that, because of the Bellino search, advice was being given to all concessionaires by P. D. Andrews, concession manager of R.A.S., that they should destroy accounting records or falsify other accounting data.

17. On July 23, 1975 based upon the information obtained through this intercept and the indications of income suppression previously derived from Casper Bellino's records, officers obtained from Provincial Judge Beaudry four separate warrants to search the fairgrounds, R.A.S. train coaches and two hotel rooms in Edmonton. The "informations" or affidavits in support of the warrants did not name any person or corporation as a suspect, and merely recited as a basis for the application that:

"Confidential information received indicates that documents described herein are being destroyed, altered, and falsified."

The documents and things to be seized, and the offense in respect of which the search was to be made, were described in the information or application (and in the warrants subsequently issued) as follows:

"Letters, notes, memoranda, contracts, agreements, reports, written, typewritten or printed matter or other documents, and copies or drafts thereof, telephone accounts, travel accounts, printing accounts, receipt books, banking statements including cancelled cheques and bank deposit books, staff directives, employee files, sales journal, cash disbursement journals, cash receipts journal, purchase journal, general accounting journal, synoptic ledgers, and all records of account, valuable securities, cash, documents pertaining to leasing or ownership of concessions or rides which will afford evidence of the commission of an offense to wit conspiracy to defraud the Government of Canada by destroying, mutilating, altering, falsifying, or making false entries in a book, paper, writing, valuable security or document contrary to the Criminal Code of Canada."

The warrant issued with respect to the Edmonton exhibition area or fairgrounds described the area to be searched as " . . . the buildings, trailers, tents, receptacles, or other places located on the grounds of the Edmonton Exhibition Association in the City of Edmonton . . ." The warrant issued with respect to the R.A.S. train described the area to be searched as " . . .

the Royal American Shows train coaches located on the railway tracks near 115 Ave. and 80 Str. in the City of Edmonton . ."

18. The warrants specifically authorized and directed that the searches be conducted between the hours of 12:30 A.M. and 11:30 A.M. on 24 July 1975; and as to that facet of the matter, given the circumstance that the carnival midway was in full business operation from approximately 10:00 A.M. through midnight each day, the search as made during the early morning hours was in fact carried out at a time that was least disruptive of the affairs of those whose premises were searched.

19. The Edmonton fairgrounds, as generally described in that manner in one of the warrants, actually encompassed an area of several acres and was the site of scores of buildings, tents, trailers and other enclosures constituting the business or residential premises of hundreds of people other than the Defendants in these cases or R.A.S. itself; and, as previously mentioned, the R.A.S. train included residential and office cars leased by R.A.S. to many different independent concessionaires.

20. The warrants were executed on July 24, 1975, between 2:00 A.M. and 6:00 A.M. by an assembled force of approximately 139 officers drawn from the R.C.M.P. and the Edmonton City Police. The group was divided into various teams and simultaneous searches were carried out in a number of places on the fairgrounds and the train, including the trailers and/or rail cars occupied by the moving Defendants. The searching officers were armed, but the weight of the evidence is that their weapons were holstered most of the time, i. e., there is no substantial evidence that any officer made excessive or unreasonable use of a firearm or that anyone was injured or endangered in any way through the use of a weapon. Indeed, while there is evidence of one minor altercation between an officer and Mrs. Popovich's son, it appears, somewhat surprisingly given the number of persons involved—including those searching as well as those being searched—that there

was no significant physical force or violence of any kind, and no one was taken into custody. Similarly, apart from damage to the door of one trailer (which the occupant refused to open), it does not appear that the searching officers damaged any of the premises; and, while the officers were thorough to the point of being overzealous in the seizure of papers and documents (which filled some 65 cartons), the search did not seriously disturb the fairgrounds or carnival operations since the entire midway and all of the concessionaires opened the show for business as usual within a few hours after the raid had been concluded.

21. On July 25, 1979, the day following the search, attorneys for R.A.S. and three of the concessionaires filed in the Supreme Court of Alberta, Trial Division, a motion to quash the warrants. A hearing was conducted on the motion by Mr. Justice Cavanagh of that Court on July 29, 1975. According to his written decision entered August 13, 1975, four arguments were advanced in support of the motion: (1) the description of the items and things to be seized was overbroad and imprecise; (2) no specific offense was described as a basis for the search; (3) with regard to the warrant pertaining to the exhibition grounds, the description of the premises to be searched was overbroad; and (4) an insufficient showing was made on the face of the applications to justify the judicial conclusion that there were "reasonable grounds" to believe that an offense had been or was being committed. Mr. Justice Cavanagh rejected the first two contentions, but sustained the latter two, and directed that the four warrants "be quashed and set aside."

22. In the meantime, on July 29, 1975, while the hearing before Mr. Justice Cavanagh was in progress, and for the obvious purpose of bolstering the legal standing of the Canadian authorities to have and retain the items taken during the search, Swartzack of the D.N.R. purported to "seize" the documents then being kept in the Edmonton Police Department by invoking the Canadian Tax Act procedure known as "seizure by ministerial authority."

23. Thus, on August 18, 1975, R.A.S. instituted proceedings in the Federal Court of Canada challenging the D.N.R. seizure made by Swartzack and seeking a return of the items taken. While that proceeding was pending in the Trial Division (August 21–November 18, 1975), all of the items seized from R.A.S. were maintained under seal pursuant to order of the court. (The sealing order apparently related only to documents seized from R.A.S. since the concessionaires were not parties to the proceedings). On November 18, 1975, the Trial Division dismissed the R.A.S. application; and, on November 20, 1975, a "retention order" was entered permitting D.N.R. to retain the items seized. An appeal was then taken to the Federal Court of Appeal which ultimately held, in an opinion entered February 1, 1977 (one judge dissenting), that the seizure had not been properly effected under the Act and that the retention order should be set aside. The Court reasoned that the Edmonton City Police Station was not a place from which seizure could be made under the relevant section of the Canadian Tax Act because it was not a place of business or a place where books of account are "kept" in the sense contemplated by that Act.

24. In the meantime, during August, 1975, after the raid and search of July 24 had occurred, news of the event was apparently transmitted by a Canadian official to the Intelligence Division of the I.R.S. office in Fargo, N. D., and that information was relayed from there to the I.R.S. office in Tampa. At that point Special Agent David E. Siegwald of the I.R.S. in Tampa began a preliminary investigation of possible violations of the Internal Revenue Code by persons connected with R.A.S., but an official "case file" was not opened until October, 1975. Siegwald testified at the hearing that the first request for assistance received from Canadian authorities in their investigation of R.A.S. was in October, 1975, and that he knew of no request by any I.R.S. agents to Canadian officials prior to November, 1975. The testimony of the Canadian witnesses is in accord.

25. During November, 1975, Orville Dahl, a representative of D.N.R. attached to the Regina District Office, traveled to Tampa, Florida, brought with him copies of some of the concessionaires' documents seized during the search, and reviewed other records pertaining to the Defendants which Agent Siegwald made available to him in Tampa. Then, in January, 1976, Siegwald traveled to Regina, Saskatchewan, where Canadian officials permitted him to review the documents seized during the search and to microfilm portions of them for his own use. Later a transcript of the intercepted Popovich telephone conversation was also supplied to Siegwald by mail.

26. In February, 1977, when the Canadian Federal Court of Appeal held the D.N.R. Seizure to be invalid (paragraph 23 above), the Attorney General of Alberta apparently obtained additional warrants to seize the fruits of the search from D.N.R. on the ground that such material constituted evidence which was needed in pending criminal charges which had been instituted against R.A.S. and others; but, rather than pressing forward with those prosecutions, the Attorney General initiated a proceeding known as a Public Inquiry under the Alberta Public Inquiries Act. Mr. Justice Laycraft of the Supreme Court of Alberta was appointed as Commissioner to conduct those proceedings which were concerned with a general investigation through public hearings dealing with "the affairs and activities in the Province of Alberta of Royal American Shows, Inc.," and also "whether any person committed any unlawful act in connection with any and all investigations or proceedings relating to [those affairs]." The report ultimately made as a result of that inquiry is popularly known as the Laycraft Report. It was issued in June, 1978, and deals in the main with matters not relevant to the pending motions. During the course of the Laycraft Commission hearings, however, many of the documents seized as a result of the search, and the intercepted Popovich telephone conversation, were received in evidence and became public information in Canada.

27. In February, 1979, the Attorney General of Alberta filed an application seeking judicial direction concerning disposition of the material still held under seizure (some of the items having already been returned from time-to-time to those from whom the seizure was made). By Orders entered on February 26, 1979, the Court of Queen's Bench of Alberta ruled that all remaining material should be returned within thirty days to the Defendants. An appeal was taken from those orders by D.N.R. and the appeal is still pending. As a consequence, the seized documents presently remain in the custody of Canadian authorities; and accordingly, pending consideration of the present motions to suppress, the United States Magistrate has issued letters rogatory to the Alberta Court in order to secure the documents (or suitable copies) in the event the motions should be denied.

### CONCLUSIONS OF LAW

1. It is well established as a basic principle of law, particularly in the Fifth Circuit, that the jurisprudence of the Fourth Amendment and the exclusionary rule designed for its enforcement do not apply to searches made by foreign authorities on their own territory even if the persons from whom the evidence is seized are citizens of the United States. The concept of deterrence underlying the exclusionary rule has no logical application to foreign officials. On the other hand, if it is shown that American agents are in privity with the search through direct participation or procurement, the rule of exclusion may be invoked. Subject to that exception, the standard to be applied in deciding the admissibility of the fruits of a foreign search is whether the circumstances surrounding the seizure are so extreme as to shock the judicial conscience. *United States v. Morrow,* 537 F.2d 120 (5th Cir. 1976); *Birdsell v. United States,* 346 F.2d 775 (5th Cir. 1965), *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15

L.Ed.2d 366 (1965). See also, *Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir. 1979). Accord, *Stonehill v. United States,* 405 F.2d 738 (9th Cir. 1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Stowe v. Devoy,* 588 F.2d 336 (2d Cir. 1978).

2. In this instance distillation of the Defendants' motions and briefs yields four arguments: (a) that the exclusionary rule should apply because of the degree of involvement of U. S. agents in the search; (b) that the provisions of the Tax Convention and Protocol Between The United States and Canada (the Treaty) preclude any use of the seized material by U. S. authorities; (c) that comity requires exclusion of the seized materials as "fruit of a poisoned tree" (the tree being the intercepted Popovich telephone conversation); and (d) that the totality of the circumstances surrounding the search and seizure should be condemned as shocking to the judicial conscience. Each of these issues will be considered in turn.

3. The involvement of U. S. authorities occurred at three different stages of the overall scenario. First, in 1974, long before the organization of the Canadian task force and the concentrated investigation by that group culminating in the disputed search during July of the following year, there was an exchange of intelligence information between the R.C.M.P. and the I.R.S. in Seattle concerning the activities of the so-called "bag men." (See paragraphs 4 and 5, Findings of Fact, *supra* ). It is noteworthy, however, that this information did not directly involve R.A.S. or any of the Defendants, and there was no joint investigative undertaking by any agents representing the two countries.[1] Second, in June, 1975, during the midst of the task force operations in Canada, someone in the R.C.M.P. called the I.R.S. office in Seattle and secured by telephone certain public record information concerning the registration of motor vehi-

---

1. It should also be noted that the exchange of general intelligence information across the border was not an unusual or special occasion. "Normal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged." *United States v. Morrow, supra,* 537 F.2d at 140.

cles in the State of Washington, but there is no evidence that the I.R.S. Agents in Seattle even knew the reason such information was wanted by the Canadians. (See paragraph 11, Findings of Fact, *supra* ). Third, after learning about the search and seizure which took place on July 24, 1975, U. S. authorities, principally Agent Siegwald, took various steps in an effort to gain access to the fruits of the search. (See paragraphs 24 and 25, Findings of Fact, *supra* ).

█ The standard to be applied in determining whether the involvement of U. S. Agents is sufficient to trigger application of the Fourth Amendment rule of exclusion has not been defined in the Fifth Circuit. In *Birdsell v. United States, supra,* the Court merely found that the degree of participation by U. S. law enforcement personnel was insufficient; no specific test was articulated. In *Stonehill v. United States, supra,* the Ninth Circuit held that Fourth Amendment jurisprudence applies to foreign searches and seizures only when U. S. agents ". . . so substantially participated in the raid so as to convert them into joint ventures . . ." 405 F.2d at 743.[2] More recently, in *United States v. Morrow, supra,* the Fifth Circuit said (537 F.2d at 140):

" . . . [W]e have no occasion to choose between the joint venture test of *Stonehill* or the apparently more relaxed test of *Birdsell.* Under either test, the minimal participation of American law enforcement officials in the [Canadian] search and seizure is insufficient to invoke . . . the protections of the fourth amendment."

Similarly, in this case as in *Morrow,* it is wholly unnecessary to struggle with any issue concerning the appropriate standard to be applied. There is simply no evidence that any representative of the United States Government initiated, supervised, directed or participated in any aspect of the preliminary investigation of R.A.S. or the search and seizure made on July 24, 1975. Indeed, there is no evidence that any U. S. agent ever knew about the raid until after it had been accomplished. There was, to be sure, an innocuous exchange of intelligence information in 1974 and on one occasion during the task force investigation in 1975, but that is all.[3] *Morrow* controls this case; the Fourth Amendment exclusionary rule is inapplicable.

4. Article XXI of the Convention and Protocol Respecting Double Taxation, March 4, 1972, United States—Canada, 56 Stat. 1399, 1406, provides:

### ARTICLE XXI

1. If the Minister [of National Revenue of Canada] in the determination of the income tax liability of any person under any of the revenue laws of Canada deems it necessary to secure the cooperation of the Commissioner [of Internal Revenue], the Commissioner may, upon request, furnish the Minister such information bearing upon the matter as the Commissioner is entitled to obtain under the revenue laws of the United States of America.

2. If the Commissioner in the determination of the income tax liability of any person under any of the revenue laws of the United States of America deems it necessary to secure the cooperation of the Minister, the Minister may, upon request, furnish the Commissioner such information bearing upon the matter as the Minister is entitled to obtain under the revenue laws of Canada.

The Defendants urge a construction of the treaty to the effect that one nation may request, and the other nation may produce,

---

2. See also *United States v. Rose,* 570 F.2d 1358 (9th Cir. 1978).

3. As discussed in more detail *infra,* the activity of U. S. agents *after* the seizure had occurred is of little importance in resolving the issue. While those activities may have some probative evidentiary value in deciding any factual disputes concerning the degree of U. S. involvement from the outset of the investigation, the privacy interests protected by the Fourth Amendment are invaded at the moment of the search and seizure, and the state of affairs existing at that moment are the most critical facts upon which the decision must be made.

only such materials as the producing nation is lawfully entitled to obtain for that purpose under its own revenue laws; and, since the Courts of Canada have held the disputed search and seizures to be invalid under Canadian law, this Court should suppress the seized materials because their acquisition by U. S. authorities would be a violation of the treaty. This contention, however, says far too much for at least three separate reasons.

■ First, it is not a fair or reasonable construction of the treaty that the nation initiating a request for information, or the courts of that nation, have any role to play in the determination of whether the revenue laws of the producing nation will permit the acquisition and delivery of the information being sought. Rather, that determination must necessarily be made in good faith by the competent authorities of the nation to which the request is addressed. Each nation is and must be the final judge of its own laws.[4] Moreover, the fact that the Courts of Canada have held the instant search and seizure to be invalid under Canadian law does not necessarily mean that a release of the seized items to U. S. authorities would also violate Canadian law or the treaty. There is no general exclusionary rule in Canada,[5] and no Canadian court has addressed the question of whether its laws would prevent the release of the items seized to U. S. authorities under the treaty, i. e., even though it might be determined that there is no treaty *obligation* upon Canada to deliver the information because of the tainted manner of its acquisition, it might still provide the information without treaty *violation*.

■ Secondly, there is no logical basis and no authority for the application of an exclusionary rule as a means of enforcing a treaty provision the application of which in this instance turns on Canadian law and activities engaged in by Canadian rather than United States officials. As in the case of the Fourth Amendment itself, an exclusionary rule aimed at Canadian agents would not serve the interest of deterrence which is the reason for the rule; and, indeed, would apply a sanction against Canadian officers which the courts of Canada do not themselves embrace. In the absence of an explicit provision of the treaty so requiring, c.f. *United States v. Postal*, 589 F.2d 862 (5th Cir. 1979), an exclusionary rule is an inappropriate means of enforcing its provisions.

■ Finally, the treaty is simply inapplicable to the facts of this case; it does not purport to establish the exclusive means whereby information may be exchanged between the nations. Rather, it constitutes a reciprocal working agreement whereby the chief taxing officials of the two countries may exchange information as needed "in the determination of the income tax liability of any person . . ." In this instance the Commissioner of Internal Revenue is not seeking any information under the treaty for purposes of determining tax liability; instead, the United States is seeking the information, pursuant to the issuance of letters rogatory by this Court, for ultimate use at trial in a criminal prosecution.

■ 5. Perhaps the most troublesome issue raised by the Defendants is the assertion that comity requires exclusion of the seized materials as "fruit of a poisoned tree,"[6] the poisoned tree being the intercepted Popovich telephone conversation of July 23, 1975. The short answer to this contention may well be found in *United States v. Morrow, supra,* in which the Fifth Circuit explicitly rejected the suggestion ". . . that it is incumbent upon the Government to demonstrate that a chal-

---

4. A representative of the Office of International Operations, Internal Revenue Service, testified at the hearing that the United States has taken the position under the treaty that it is obligated to furnish only those documents the I.R.S. can lawfully obtain and disclose under U.S. law.

5. Fontana, *The Law of Search Warrants In Canada*, Chap. 5, Section 63 (1974).

6. *Wong Sun v. United States*, 371 U.S. 471, 477–478, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

lenged search is legal under the law of the country where it takes place." 537 F.2d at 140.[7] Even so, given the particular facts of this case, the defense argument is worthy of further examination.

It is contended, in effect, that the interception of the Popovich conversation led directly to the issuance of the warrants and the subsequent search; that the interception was unlawful under the Canadian Protection of Privacy Act just as it would have been unlawful under a substantially similar statute (18 U.S.C. § 2510 et seq.) if the event had occurred here in the United States; and that it would be both logically and legally anomalous, and contrary to the concept of comity, to conclude under those circumstances that the fruit of the conversation is somehow admissible when offered in evidence here. This argument, of course, has considerable superficial appeal; but, with one narrow exception, it will not withstand analysis.

The major premise of the argument is that the interception of the Popovich telephone conversation was beyond the purview of any judicial authorization obtained under the Canadian Protection of Privacy Act, Part IV-1, Criminal Code of Canada, § 178.1 et seq. (see paragraph 13, Findings of Fact, *supra*), and that such interception was therefore a violation of that Act. It should be noted that no judicial adjudication to that effect has been rendered in Canada.[8] However, after discussing the facts and the pertinent Canadian law, Mr. Justice Laycraft concluded in his Report as follows: [9]

"In my view, interception of calls at the Plaza Hotel was authorized. I am unable to conclude, however, that the transfer of the interception devices to the telephone at the Popovich trailer complied with the authorization.

\* \* \* \* \* \*

". . . In my view, there was no authority, under the clauses of the Edmonton authorization dealing with telephone calls, to intercept calls to or from the Popovich trailer whether or not James Breen [or Mark Popovich] made them. The interceptions were wrongful acts, though I believe Cpl. Bannerman thought, in good faith, interception was authorized."

Accordingly, for purposes of this proceeding, I accept the proposition that the interception of the Popovich telephone conversation was a violation of Canadian law; and, of course, it has already been concluded as a fact that the search warrants and the search itself were predicated in large measure upon the information gleaned from that conversation. (See paragraph 17, Findings of Fact, *supra*).[10]

Thus, as a minor premise of their argument, Defendants assert that the fruits of the search would not be admissible in Canada given the express exclusionary rule embodied in the Canadian statute; and, therefore, they conclude, citing *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) as analogous authority,[11] this Court should also exclude the evi-

---

7. See also *United States v. Cotroni,* 527 F.2d 708 (2d Cir. 1975), in which it was held that the contents of certain telephone conversations intercepted in Canada without judicial authorization were admissible in evidence in a criminal prosecution in the Eastern District of New York. The interceptions occurred, however, before enactment of the Canadian Protection of Privacy Act.

8. Specifically, in the decision quashing the warrants (see paragraph 21, Findings of Fact, *supra*), the Canadian Court did not address any issue concerning the validity of the interception of the Popovich telephone conversation.

9. Report of A Public Inquiry, Royal American Shows Inc. and Its Activities in Alberta, Mr. Justice James H. Laycraft, Commissioner, June, 1978, page C-77. See paragraph 26, Findings of Fact, *supra.*

10. Mr. Justice Laycraft reached the same conclusion in his Report.

11. The rule of exclusion as a means of enforcing the Fourth Amendment was first devised in 1914 in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), but the rule was applied only to searches by federal officers. This gave rise to the "silver platter doctrine," i.e., evidence unlawfully seized by state officers could be handed over on a silver platter

dence in the interests of comity. It is here that the argument breaks down. There are three flaws: (a) the limited exclusionary rule embodied in the Canadian statute does not apply to the advantage of any of the Defendants other than the Popovichs; (b) even as to the Popovichs, it is a doubtful question as to whether the Canadian courts would exclude the evidence; and (c) the principle of comity is largely inapposite.

(a) During 1975, at the time in question, the Canadian Protection of Privacy Act, Part IV–1, Criminal Code of Canada, § 178.-16, provided as follows: [12]

"(1) A private communication that has been intercepted and evidence obtained directly or indirectly as a result of information acquired by interception of a private communication are both inadmissible as evidence against the originator thereof or the person intended by the originator thereof to receive it unless

"(a) the interception was lawfully made; or

"(b) the originator of the private communication or the person intended by the originator thereof to receive it has expressly consented to the admission thereof.

"(2) Where in any proceedings the judge is of the opinion that any private communication or any other evidence that is inadmissible pursuant to subsection (1)

"(a) is relevant, and

"(b) is inadmissible by reason only of a defect of form or an irregularity in procedure, not being a substantive defect or irregularity, in the application for or the giving of the authorization under which

such private communication was intercepted or by means of which such evidence was obtained, or

"(c) that, in the case of evidence, other than the private communication itself, to exclude it as evidence may result in justice not being done,

"he may, notwithstanding subsection (1), admit such private communication or evidence as evidence in such proceedings."

■ For purposes of comparison, the corresponding provision of the United States statute, 18 U.S.C. § 2515, is as follows:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

Significantly, under the Canadian statute, the rule of exclusion is applicable only with respect to ". . . the originator [of the intercepted communication] or the person intended by the originator thereof to receive it." Accordingly, as expressly noted by Mr. Justice Laycraft in his Report (page E–23), the moving Defendants other than the Popovichs have no standing to assert the statutory rule of exclusion as an independent bar to the admission against them of evidence derived from that source.[13] It

---

for use in federal court. In *Elkins*, relying in part upon the principle of comity, the Court condemned that doctrine and held that the exclusionary rule should be applied to all governmental seizures made in violation of the Fourth Amendment, whether state or federal.

**12.** A copy of the Canadian Act (containing also the amendments effected by the Criminal Law Amendment Act of 1977) was offered and received in evidence as Defendant's Exhibit 13.

**13.** They may, of course, point to the unlawful nature of the interception as one of the factors

to be considered *infra* in determining whether the overall circumstances shock the judicial conscience. Also, with regard to any issue of "standing" in general as it might relate to particular items seized during the search itself, the Government represented at the hearing that it would seek to offer in evidence at the trial of each of these cases, respectively, only those items seized from the premises of the particular Defendant or Defendants on trial in each case, respectively, and each Defendant therefore has standing to press the pending motions to suppress.

is also of interest and perhaps of some relevance to note that the result would be the same if all of the pertinent events had occurred in the United States. Although 18 U.S.C. § 2515 would seem to be absolute in scope, § 2518(10)(a) provides that only an "aggrieved person" may move to suppress unlawful interceptions, and § 2510(11) defines an aggrieved person as "a party to any intercepted wire or oral communication or a person against whom the interception was directed." Consequently, the moving Defendants, other than the Popovichs, would lack standing. See *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and *United States v. Scasino,* 513 F.2d 47 (5th Cir. 1975). *Cf. Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

(b) With respect to the specific argument presently being considered—that comity requires exclusion of the evidence as fruit of the "poisoned" Popovich telephone interception—the posture of the Popovichs is different from the other Defendants; their standing to press the argument is apparent. In addition, they have filed a separate motion seeking suppression of the intercepted conversation itself.

 Accordingly, if one proceeds beyond the threshold issue of the parties' standing to object under the Canadian Protection of Privacy Act, the next question that arises is whether, under that Act, the evidence seized during the search (as distinguished from the content of the conversation itself) would be suppressed or excluded by the Courts of Canada if offered against the Popovichs in any proceedings pending there. As previously quoted in full, § 178.16(1)(a) and (b) of the Canadian Act as it existed in 1975 clearly states the general rule of the statute to be that, absent consent of the parties, an unlawfully intercepted conversation "and evidence obtained directly or indirectly as a result of information obtained by interception" of the communication are inadmissible as evidence against the parties

to the conversation. However, as an exception to the general rule, § 178.16(2)(c) states with equal clarity that if a judge "in any proceedings" determines that the disputed evidence is relevant and "that, in the case of evidence, *other than the private communication itself,* to exclude it as evidence may result in justice not being done, he may, notwithstanding subsection (1) admit such . . . evidence as evidence in such proceedings." The Canadian Criminal Law Amendment Act of 1977 re-ordered the emphasis of the statute so as to provide for the admission of derivative evidence as the general rule, with exclusion of such evidence as an occasional exception. Specifically, after providing as before that the content of an unlawfully intercepted communication shall be inadmissible as evidence, against the parties to the conversation, the amended statute concludes:

". . . but evidence obtained directly or indirectly as a result of information acquired by interception of a private communication is not inadmissible by reason only that the private communication is itself inadmissible as evidence.

"(2) Notwithstanding subsection (1), the judge or magistrate presiding at any proceedings may refuse to admit evidence obtained directly or indirectly as a result of information acquired by interception of a private communication that is itself inadmissible as evidence where he is of the opinion that the admission thereof would bring the administration of justice into disrepute."

Whether the original or the amended statute would be applied as the law of Canada in this case is of little or no consequence.[14] The point is, under either provision, it cannot be asserted with any reasonable degree of probability that the fruits of the search would be excluded in Canada even as against the Popovichs. Certainly no court in Canada has yet ruled to that effect; and, indeed, Mr. Justice Miller of The Court of Queen's Bench of Alberta

---

**14.** Mr. Justice Laycraft in his Report (page E–18) noted a possible issue concerning the retroactivity of the 1977 Amendments, but he did not find it necessary to decide the question (page E–25).

effectively declined to so hold in his decision passing upon the letters rogatory issued by the United States Magistrate in these cases. (See paragraph 27, Findings of Fact, *supra*).[15]

In his written decision Mr. Justice Miller articulated several guidelines established by the Canadian precedents to be applied in responding to letters rogatory from foreign courts. Among the factors he considered were the relevancy of the evidence being sought and the question whether the persons to be called upon to produce that evidence could be required to do so under Canadian law if the litigation was pending there. He ultimately held, applying the Protection of Privacy Act, that the intercepted Popovich communication should *not* be disclosed at any proceeding involving the Popovichs; but, in all other respects, it was decided that the material sought by the Government should be produced (including the intercepted Popovich communication itself if the presiding officer should determine its contents to be relevant to the charges pending against the Defendants other than the Popovichs). Significantly, insofar as the Popovichs are concerned, the Court's decision to withhold the intercepted communication did not prompt a decision that the other derivative evidence should also be withheld as to them.

■ (c) The Defendants having failed to demonstrate [16] that the law of Canada would clearly require rejection of the disputed evidence (except the intercepted Popovich communication if offered against the Popovichs themselves), it follows that the concept of comity is largely inapposite. It would be no affront to Canada or the concept of comity between nations to admit as against any of the Defendants the evidence seized as a result of a search.

The question remains, however, as to whether considerations of comity dictate exclusion of the intercepted Popovich communication in the Popovich case. Defend-

ants' reliance upon *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) as analogous authority is misplaced. The Court was more concerned in that instance with the ". . . essence of a healthy federalism [which] depends upon the avoidance of needless conflict between state and federal courts." 364 U.S. at 221, 80 S.Ct. at 1446, 4 L.Ed.2d 1669. The concept of comity between the states or between the states and the federal government should be differentiated from the concept of comity between nations. In *Bond v. Hume*, 243 U.S. 15, 22, 37 S.Ct. 366, 368, 61 L.Ed. 565 (1917), the Court said:

"It is certain that these principles [of comity] which govern as between countries foreign to each other apply with greater force to the relation of the several states to each other, since the obligations of the Constitution which bind them all in a common orbit of national unity impose of necessity restrictions which otherwise would not obtain, and exact a greater degree of respect for each other than otherwise by the principles of comity would be expected."

■ Nevertheless, the principle of comity between nations is a recognized force in the law and should be respected. In *Hilton v. Guyot,* 159 U.S. 113, 163–164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895), the Court held:

"No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call 'the comity of nations.' Although the phrase has been often criticised, no satisfactory substitute has been suggested.

---

**15.** The decision of Mr. Justice Miller was issued September 12, 1979, and has now been filed as a part of the record in these cases.

**16.** The Defendants bear the burden of persuasion. See *United States v. De La Fuente*, 548 F.2d 528 (5th Cir. 1977); *United States v. Evans*, 572 F.2d 455 (5th Cir. 1978).

" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."

■ In this instance, although mindful of the rule that it is not incumbent upon the Government to demonstrate the legality of a search or a telephonic interception under the law of the country where the event occurred, I do not deem that rule to be dispositive of the case when it has been affirmatively established by the Popovichs that the interception was *unlawful* under Canadian law;[17] that the content of the intercepted conversation could not be used in evidence against them in Canada; and that, had the interception been made in the United States, it would have been equally unlawful and the content of the conversation equally inadmissible. The motion in the Popovich case to suppress the content of the intercepted telephone conversation of July 23, 1975, between Mark and Nina Popovich will be granted.[18]

■ 6. The last issue to be decided is whether the totality of the circumstances surrounding the search and seizure are so shocking to the judicial conscience that the Court should not countenance any use of the evidence obtained. The Defendants claim that there was never any probable cause to believe that they had committed any offense whatever; that the search warrants were based upon a "patently illegal

wiretap . . . a criminal act in itself"; that the Canadian officers falsified affidavits in procuring the issuance of the warrants (i. e., the affidavits stated that "confidential information" had been received when, in fact, the information was obtained from an illegal wiretap);[19] that the search warrants were overbroad and invalid under the law of Canada and the United States; and that the conduct of the officers executing the search was "so outrageous in character as to constitute an affront to any court in which evidence derived therefrom might be offered . . . It was virtually an armed attack led by officers displaying . . . a flagrant disregard for persons and property, who seized virtually everything on the fairgrounds, except the railroad cars, and left behind them a shambles." Reliance is also placed upon events occurring after the July 24 raid, namely, the ineffective and unlawful "seizure" of the fruits of the search by D.N.R. on July 29, 1975; an assertion that Swartzack of D.N.R. allegedly gave false testimony in the Federal Court of Canada during the proceedings concerning that seizure;[20] and the exchange of copies of documents by Canadian and U.S. agents with knowledge that they had been seized illegally.

Although an increasing number of cases continue to announce that foreign searches are to be judged by the shocking-to-the-conscience standard, it is interesting that none have yet reflected a fact pattern which the reviewing court found to be shocking. See *Stowe v. Devoy*, 588 F.2d 336, 342 (2d Cir. 1978). There is, as a result, very little practical guidance in the form of comparative authority; each case must be decided on its own facts.

17. Compare *United States v. Cotroni*, 527 F.2d 708 (2d Cir. 1975).

18. The Government will be precluded from offering the suppressed evidence during its case in chief. Circumstances might arise, however, permitting its use during the defense case or in rebuttal. See *United States v. Caron*, 474 F.2d 506 (5th Cir. 1973).

19. The claim that the affidavits or informations were falsified is, at best, an exercise in hyperbole. The "confidential information" referred

to was the intercepted Popovich telephone conversation which, because of the statute, the officers were hesitant to disclose in a public document. Their choice of the phrase "confidential information" was an effort to be discreet, not an attempt at deception. Laycraft Report, page B–18.

20. It appears that Swartzack has been charged with perjury but the case has not been tried or otherwise resolved.

In this instance it is clear that, if the disputed search warrants had been sought and issued in the United States, they would ultimately have suffered the same fate they have experienced in Canada, and for the same reasons. The affidavits or informations were facially insufficient to establish probable cause and the warrants were grossly overbroad. The fact remains however, that both the Popovich wiretap and the search were carried out at the time pursuant to judicial process issued and executed in good faith, only later determined to be defective. It seems to me, therefore, as a matter of law, that something more shocking than this must appear before suppression would be warranted; otherwise the court would merely be applying traditional Fourth Amendment law excluding evidence seized pursuant to a defective warrant.

<!-- redacted --> The question arises, then, as to whether there was anything shocking in the manner in which the warrants were executed; and, in that regard, the Defendants' exaggerated claims are simply not supported by a preponderance of the credible evidence. (See paragraph 20, Findings of Fact, *supra*).[21]

Lastly, there is the question concerning post search events, notably the D.N.R. seizure on July 29 and the Swartzack testimony concerning D.N.R. participation in the task force. As suggested previously, however, it seems to me that these events are entitled to little weight in the overall evaluation to be made. Although the Fourth Amendment does not apply, it is the personal privacy interest protected by the Fourth Amendment [22] (and perhaps the right to due process and a fair trial guaranteed by the Fifth Amendment) that would be vindicated by application of a rule of exclusion in the circumstances of this case; and, in that regard, the Defendants' privacy interests had already been invaded and their property seized as of July 25. Whether Swartzack

subsequently gave false testimony could neither add to nor detract from that circumstance. Further, and in any event, the D.N.R. seizure of July 29 was not a shocking act. It was nothing more than a colorable legal maneuver, later determined to be ineffective.

Whether viewed in isolation or as a whole, I am unable to conclude that the circumstances surrounding the search and seizure were so egregious as to be shocking to the judicial conscience.

The motion to suppress the content of the intercepted Popovich telephone conversation of July 23, 1975, is GRANTED in Case No. 79–49 CR–T–K. In all other respects the motions to suppress are DENIED.

IT IS SO ORDERED.

---

21. It should be remembered that any unexpected, involuntary search and seizure would be a shocking experience for any person of ordinary sensitivities. Obviously, therefore, the case must be viewed from the detached perspective of an objective judicial officer and not through the eyes of the person being searched.

22. See *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).