**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Deborah DELAPLANE, Paul Mosher**
**and Michael O'Brien,**
**Defendants/Appellants.**

**Nos. 84–1312, 84–1796 and 84–1798.**

United States Court of Appeals,
Tenth Circuit.

Dec. 2, 1985.

Bruce F. Black (Robert N. Miller, U.S. Atty., with him on brief), Asst. U.S. Atty., Denver, Colo., for plaintiff/appellee.

Joseph Saint-Veltri, Denver, Colo., for defendant/appellant Delaplane.

Steven Janiszewski (Rod W. Snow, with him on briefs), of Dixon & Snow, P.C., Denver, Colo., for defendants/appellants Michael O'Brien and Paul Mosher.

Before BARRETT and SEYMOUR, Circuit Judges, and GREENE,[*] District Judge.

BARRETT, Circuit Judge.

These consolidated appeals are before us in accordance with Fed.Rules Cr.Proc. rule 11(b), 18 U.S.C. Under Rule 11(b), a defendant "may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pre-trial motion." Rule 11(b) also provides that if "the defendant prevails on appeal, he shall be allowed to withdraw his plea."

Michael O'Brien (O'Brien), Paul Mosher (Mosher) and Deborah Delaplane (Delaplane)[1] were indicted on March 30, 1983, and charged with conspiracy to distribute cocaine. Delaplane was also charged in a separate count with possession with intent to distribute cocaine. Prior to trial, appellants, collectively, filed some 43 motions which were joined by the district court for determination. Motion hearings extended over five days.

Evidence presented during the motion hearings tended to establish that from November, 1981, through March, 1983, Corporal Neal A.J. Kingdon, of the National Crime Intelligence Section of The Royal Canadian Mounted Police, Red Deer, Alberta, Canada, was engaged in an ongoing investigation into the suspected drug activi-

---

[*] The Honorable J. Thomas Greene, United States District Judge for the District of Utah, sitting by designation.

[1] Hereinafter collectively referred to as appellants.

ties of O'Brien, a resident of Red Deer. During the course of the investigation, Cpl. Kingdon contacted Special Agent James R. Poland, U.S. Customs Service, Blaine, Washington, on January 21, 1983, and requested routine intelligence information about prosecutorial guidelines for Florida cocaine cases.

On January 24, 1984, Poland responded (via telephone) to Kingdon's inquiry and learned that O'Brien was the subject of the earlier inquiry. During their conversation Kingdon also asked Poland for the identity of the subscribers of certain United States telephone numbers. Subsequent thereto, between February 1 and 9, 1983, Poland and Kingdon had several additional telephone conversations during which Poland responded to Kingdon's telephone subscriber inquiries and Poland related that a computer inquiry on O'Brien had disclosed a Canadian conviction which affected O'Brien's immigration status into the United States.

On March 22, 1983, Kingdon, acting on information received from an unidentified informant that O'Brien was to be involved in a "major drug transaction" that was to occur "very soon," applied for and received an order from the Queen's Bench of Alberta, Canada, for a wiretap of O'Brien's telephone at his Red Deer residence.

On March 23, 1983, a conversation was intercepted which indicated that O'Brien was going to drive to Great Falls, Montana, and meet a woman named "Deb"; O'Brien was to give Deb some money which she was to take to San Francisco; O'Brien was to drive to Denver, Colorado, where he would meet with Deb and Mosher; and that once in Denver, O'Brien would receive the drugs. After receiving the call, Kingdon contacted Poland who in turn contacted other agents in Great Falls and Denver to establish surveillance of Delaplane and O'Brien.

Delaplane, O'Brien, and Mosher were all arrested on March 25, 1983, at Denver's Stapleton Airport shortly after Delaplane's incoming flight had arrived. Delaplane was searched at the time of her arrest and officers seized one package of cocaine from her pocket and a second package of cocaine taped to her leg.

Following hearings on appellants' pre-trial motions, *supra*, the district court entered an order on September 6, 1983, finding, *inter alia:* that the Canadian wiretap and the evidence derived therefrom need not be suppressed; that the evidence seized during a search of O'Brien's home shortly after his arrest was admissible; the search of Delaplane was a reasonable one incident to her arrest; and that the search of Mosher's trunk following his arrest was unlawful and the evidence seized in conjunction with the search inadmissible.

On January 30, 1984, Delaplane entered a conditional plea in accordance with Rule 11(b). On April 16, 1984, prior to the commencement of O'Brien's and Mosher's trial, the district court ruled that the Government could use both the original tape recordings of several wiretapped telephone conversations and also recorded voice exemplars of the defendants in presenting its case (R., Supp. Vol. III at 3–10).

On April 17, 1984, after a mistrial due to the absence of a juror, Mosher entered a Rule 11(b) conditional plea. O'Brien entered his Rule 11(b) conditional guilty plea the following day.

On appeal O'Brien and Mosher contend: (1) the evidence derived from the Canadian wiretap was inadmissible and should have been suppressed; (2) the court erred in ruling that it would allow the Government to establish their identification through the use of hearsay statements; and (3) the court erred in its ruling on the voice exemplars. Delaplane contends: (1) the evidence obtained from the Canadian wiretap was inadmissible; (2) the evidence seized from her at the time of her arrest was inadmissible; and (3) the court erred in imposing on her, in addition to a sentence of confinement, a special parole term of three years.

## I.

The appellants contend that the evidence derived from the Canadian wiretaps was

inadmissible and that the district court erred in denying their motions to suppress the contents of the wiretaps authorized by the Canadian court. Appellants contend that the wiretaps did not comply with the laws of Canada and the evidence derived therefrom would thus, have been inadmissible in Canada; further, that had the wiretaps occurred in the United States the evidence derived therefrom would have been equally inadmissible under 18 U.S.C. § 2510 *et seq.* Appellants argue that federal agents of the United States substantially participated with Canadian officials so as to convert the investigation, including the wiretaps, into a joint venture, thus rendering the wiretaps subject to the exclusionary rule. Lastly, appellants argue that the totality of the circumstances surrounding the wiretaps, and the subsequent searches and seizures by the Canadian and United States agents are so shocking to fundamental notions of due process recognized in the United States as to warrant the exclusion of any evidence obtained therefrom.

 The standard most consistently set forth in reviewing the applicability of the exclusionary rule to evidence seized by foreign police, and that which we now adopt, is set forth in *United States v. Hensel,* 699 F.2d 18 (1st Cir.1983), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983) wherein the court held:

We first consider whether the "exclusionary rule" does not apply to this search because it was conducted by Canadians. As the government points out, the "exclusionary rule" does not require the suppression of evidence seized by foreign police agents, for the actions of an American court are unlikely to influence the conduct of foreign police. *See United States v. Rose,* 570 F.2d 1358, 1361–62 (9th Cir.1978); *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir.1976), *cert. denied sub nom. Martin v. United States,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). This principle does not dispose of the case, however, for there are two well-established exceptions

to this rule: (1) where foreign police conduct "shock[s] the judicial conscience," *id.* at 139 and (2) where American agents "participated in the foreign search, or ... [the foreign officers acted] as agents for their American counterparts...."
699 F.2d at 25.

 In determining that the evidence derived from the Canadian wiretaps was admissible in the case at bar, the district court found, *inter alia:*

Interesting enough, examination of the issues raised here begins with the Government's concession that if the Canadian order and the subsequent events were to be judged by the standards of 28 U.S.C. § 2510, *et seq.,* they would fail the test. Yet, given the nature of the Canadian statutes regarding wiretap, this is not startling. Indeed, § 178.1 to 178.23 of the Canadian Criminal Code (relating to invasions of privacy) can easily be characterized as less stringent in terms of its requirements than its American counterpart. With that preamble, let us turn to the specific arguments.

\* \* \* \* \* \*

The seminal question is whether the failure of the Canadian authorities to follow the mandates of 18 U.S.C. § 2510, *et seq.* or the defendants' inability to obtain the disclosure of information pursuant to 18 U.S.C. § 2518(a) requires an equitable remedy. After consideration, I believe that question should be answered in the negative.

From the evidence presented to me, it is my conclusion the institution of the interception was for the investigation of a Canadian offense, and it was not a product of a cooperative effort between Canadian and American authorities.

\* \* \* \* \* \*

This conclusion is supported by the testimony relating to the nature of the information sought by Kingdon and conveyed by Poland. From the time of the first conversation on January 21, 1983, to the conversation of March 23, 1983, Poland responded to specific informational

requests from Kingdon.... * am convinced that while information was passed over the border, and while there was contact between Canadian authorities and agencies of the United States, two things are clear. First, the investigation leading to the Canadian wiretap was solely Canadian in nature. Second, American agencies did not become interested in any of the defendants as suspects in American offenses until March 23, 1983.

I must therefore conclude there was no joint endeavor between American and Canadian agencies in obtaining the Canadian interception order or the actual interception of conversations involving Defendant O'Brien. As this was a wholly foreign investigation, there is no reason why it should be judged by American standards. *U.S. v. Orman,* 417 F.Supp. 1126 (D.Colo.1976); *U.S. v. Stonehill,* 405 F.2d 738 (9th Cir.1969). Compare, *U.S. v. Phillips,* 479 F.Supp. 423 (M.D. Fla.1979).

* * * * * *

Defendants have argued their inability to effect rights otherwise cognizable in this proceeding coupled with the circumstances under which the Canadian wiretap culminated in this case should shock the senses of the Court to the extent dismissal or suppression should result in order to protect the concepts of justice and fair play. I disagree.

I can find no evidence of misconduct or other activity which indicates investigative or prosecutorial overreaching. I must concluded (sic) the evidence leading to the initiation of the American investigation was procured within the limits of Canadian law and that the American investigation produced ample probable cause for the arrest of the defendants. Despite the fact the Canadian wiretap law is less protective of the accused than its American counterpart, I do not believe, when followed properly, the use of that law should result in the dismissal of charges against these defendants or the suppression of evidence against them.

R., Vol. I at 102–105. The record supports these findings of the district court. The conduct of the Canadian officers does not "shock the judicial conscience" nor did the participation of the American officers give rise to a joint venture. *United States v. Hensel, supra.* We hold that the district court did not err in finding that the evidence derived from the Canadian wiretaps was admissible.

## II.

■ O'Brien and Mosher contend that the district court erred in ruling that it would permit the Government to identify them through the use of hearsay statements attributable to support personnel. This argument, which is made without citation to the record, challenges the district court's ruling that it would allow the introduction of a wiretapped telephone conversation between an unidentified male and an unidentified female in which the female exclaimed "Michael's back." The court ruled that the section of the tape would be admitted under Rule 803, Fed.R.Evid. 18 U.S.C. as evidence of the identity of one of the appellants, over the objection of O'Brien that the statement was inadmissible hearsay.

We hold the district court did not err in admitting the statement pursuant to Rule 803, under which statements are not excludable as hearsay even though the declarant is unavailable as a witness if the statement is "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

## III.

■ O'Brien and Mosher contend that the district court erred in ruling that it would allow voice exemplars of them to be played to the jury and to provide the jury with transcripts of said exemplars. The voice exemplars were made in two ways, one with the defendants reading Time Magazine and one with the defendants reading the transcript from the original wiretap tapes. On the morning of O'Brien's and

Mosher's trial date, the following colloquy occurred between the district court and trial counsel:

THE COURT: All right, he's going to use the original tapes plus the exemplars, is that correct?

MR. BLACK: That's correct, Your Honor. The exemplars were made, in two ways, one reading the Time Magazine article and one reading the transcript.

I would propose to play both of those for each defendant, and play them in comparison to the composite tape.

MR. SNOW: Of course—I think I'm speaking for both parties—we, of course, object to the fact they had to give oral testimony, which violated their Fifth and Sixth Amendment rights. Second, and more importantly, our position is to read the actual transcript itself is, additionally, inflammatory to the jury, highly prejudicial, and, at best, the Court should relegate this to the reading of the extraneous material, pursuant to the two cases cited by Mr. Black, and I believe it is Williams that stated innocuous material, like in that case, Time Magazine, that it should not be highly prejudicial. The only case left is the *Brown* case that he could rely on in this court, and we submit to the Court that's not the law in the Tenth Circuit.

THE COURT: Do you have any law to the contrary?

MR. SNOW: No.

THE COURT: All right, I'm going to allow the government to proceed with the exemplars. I don't think his exemplars are a waiver of the Fifth and Sixth Amendments. I will, however, when the transcripts are produced, I will give the jury a cautionary instruction that the evidence in the case is the original tape or tapes, and their contents, and that the transcripts are submitted simply as a guideline to assist them in understanding the evidence, and if there is any discrepancy with what they hear in the tapes and what they see on the tapes, they are to be guided by the tapes.

MR. SNOW: With that, again, we object to the transcripts, because the tapes are there, but assuming they are going to the Court and to the jury and only for their reading during the playing, and not as an exhibit—

THE COURT: That's correct.

R., Supp. Vol. III at 4–5.

■■■ The compelled production of voice exemplars to be used to measure the physical properties of the witnesses' voices, and not for the testimonial or communicative content of what was to be said, does not give rise to a violation of the Fifth Amendment's privilege against self incrimination, *United States v. Dionisio*, 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973). Nor, for that matter, does requiring a defendant to demonstrate his voice by speaking the exact words spoken at the crime. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The privilege attaches only to testimonial compulsion and does not attach to demonstrative, physical or real evidence. *United States v. Williams*, 704 F.2d 315, 317 (6th Cir.1983), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679. *See also United States v. Lamb*, 575 F.2d 1310, 1316 (10th Cir.1978), *cert. denied*, 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978).

The voice exemplars opposed by O'Brien and Mosher were not being offered for the testimonial or communicative evidence of what was said, but rather, and only for comparative purposes. The law in this area was well summarized in *United States v. James*, 496 F.Supp. 284 (W.D.Okl. 1977). The court there stated:

A tape recording of a conversation between an accused and another may be admissible in evidence against the accused. *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *United States v. Quintanta*, 457 F.2d 874, (10th Cir.1972), *cert. den.* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130. Tapes of an accused's conversation with law enforcement officers, voluntarily made, may also be admissible. *Allen v. United States*, 333 F.2d 679 (1st Cir.

1964), *cert. den.* 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed.2d 47. Even if the recording was made without the accused's knowledge, it may be admissible. *United States v. Klosterman,* 147 F.Supp. 843 (E.D.Penn.1957). Courts have recognized that requiring a Defendant to give a demonstration of his voice for identification purposes by speaking the exact words spoken at the commission of a crime is not violative of his privilege against self incrimination. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *State v. Freeman,* 195 Kan. 561, 408 P.2d 612 (1965) *cert. den.* 384 U.S. 1025, 86 S.Ct. 1981, 16 L.Ed.2d 1030; *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972); *United States v. Raymond,* 337 F.Supp. 641 (D.C.Cir.1972); *United States v. Askins,* 351 F.Supp. 408 (D.Md.1972). Nor do required voice exemplars violate the prohibition against unreasonable search and seizure. *In re Dini,* 322 F.Supp. 393 (N.D.Ill.1971). Claims that a person's right to equal protection of the laws has been violated by requiring a person to speak in a line up for voice identification have been rejected. *Gilbert v. United States,* 366 F.2d 923 (9th Cir.1966), *cert. den.* 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370; *Stiltner v. Rhay,* 371 F.2d 420, (9th Cir. 1967), *cert. den.* 387 U.S. 922, 87 S.Ct. 2038, 18 L.Ed.2d 977.

496 F.Supp. at 288.

We hold that the district court did not err in ordering the compelled production of voice exemplars from O'Brien and Mosher and in approving the Government's proposed voice identification procedure. The district court properly related to counsel that it would give the jury a cautionary instruction that the evidence in the case was the original tapes, and that the jurors were to be guided by them.

## IV.

■ Delaplane contends that any evidence seized directly or indirectly as a result of the search of her person at the time of her arrest at Denver's Stapleton Airport should be suppressed. Delaplane argues that the Government failed to establish probable cause to arrest her, that neither arrest warrants nor search warrants were obtained by the arresting officers; and that under the "fruit of the poisonous tree doctrine," the evidence seized during the search of her person should have been suppressed.

In determining that the search of Delaplane was reasonable incident to her arrest, the district court found:

> Defendant Delaplane was searched by DEA Agent Gloria Woods. Agent Woods was called to Stapleton Airport by her supervisor who indicated a female suspect was going to be taken into custody.

> \* \* \* \* \* \*

> Before arriving, Woods was also aware that the "female" she was to contact was probably carrying narcotics. Defendant argues not only was there no probable cause for her arrest, but also because of Agent Woods awareness, the warrantless search of her person was unreasonable as the arresting agents could neither justify it upon the possibility she was armed nor upon any other exigency.

> First, from my initial recitals, I believe the evidence disclosed the officers had sufficient probable cause to arrest all three defendants.

> \* \* \* \* \* \*

> Second, as to Defendant Delaplane, the fact that she had probably gone through a metal detector in San Francisco does not make unreasonable a "pat down" search at a subsequent time. I believe the search of her person was a reasonable incident to her arrest. *Michigan v. DeFillipo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), *U.S. v. Hansen,* 652 F.2d 1374 (10th Cir.1981).

R., Vol. I at 00106.

In *Michigan v. DeFillipo,* cited by the district court, the Court held:

> The constitutionality of a search incident to an arrest does not depend on whether

there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search.

443 U.S. at 35, 99 S.Ct. at 2630. *See also Lavicky v. Burnett,* 758 F.2d 468, 474 (10th Cir.1985). We there observed that a valid search incident to arrest requires that the arrest and search be substantially contemporaneous.

Applying these standards, we hold that the district court did not err in denying Delaplane's motion to suppress the evidence derived from the search of her person.

### V.

We have carefully considered the appellants' remaining allegations of error. We hold that they are, individually and collectively, without merit.

AFFIRMED.